919 A.2d 1177

**Tina A. HALL, Guardian**

v.

**The UNIVERSITY OF MARYLAND MEDICAL SYSTEM CORPORATION.**

**No. 75, Sept. Term, 2004.**

Court of Appeals of Maryland.

March 21, 2007.

Wayne M. Willoughby (Zev T. Gershon, M.D., J.D., GGershon, Willoughby, Getz & Smith, LLC, Owings Mills, on brief), for appellant.

J. Mark Coulson (Scott Haiber, Amy K. Eroh, Miles & Stockbridge, P.C., Baltimore, on brief), for appellee.

Argued before BELL, C.J., RAKER, WILNER,\* CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

BELL, C.J.

This is a medical malpractice action against the University of Maryland Medical Systems Corporation ("UMMS"), the appellee. It arises from the birth of Teonna Boyce, the appellant,[1] by emergency cesarian section ("c-section") at the University of Maryland Hospital on November 12, 1992. UMMS is the parent corporation of the hospital. The appellant presents two issues:

---

\* Wilner, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Teonna's interests are represented by her guardian, Tina A. Hall, Esquire.

"1. Whether the court erred by excluding as hearsay certain entries in the Defendant's own medical records pertaining to the medical history of the minor child and her mother at the Defendant Hospital?

"2. Whether the court erred by excluding certain entries in the Defendant's own medical records pertaining to the medical history of the minor child and her mother at the Defendant Hospital on the basis they were not relevant to corroborating the testimony and rehabilitating the credibility of the minor child's mother?"

Underlying these issues is the factual dispute with respect to the appellee's culpability for the appellant's injuries and damages. The appellant contends that her mother sought treatment at UMMS and waited in the hospital, without treatment, for approximately five hours before the emergency c-section was performed. The appellee, on the other hand, maintains that the appellant's mother arrived at the hospital just prior to her emergency c-section. The trial court resolved the dispute, when ruling on a motion *in limine* filed by the appellee, by excluding from the appellant's medical records, created by the hospital, two entries tending to corroborate the appellant's contention that her mother was seen by someone at the hospital at approximately 2:00 a.m. on November 12, 1992. Thereafter, in a bifurcated trial, the jury returned a verdict in favor of UMMS on the issue of liability. The appellant noted this appeal to the Court of Special Appeals, but, prior to that court's consideration of the matter, we, on our own motion, issued a Writ of Certiorari. *Hall v. UMMS*, 383 Md. 211, 857 A.2d 1129 (2004).

Answering the first question in the affirmative, we shall hold that the trial court erred as a matter of law by excluding the two entries in the appellant's medical records on the grounds that they were hearsay. The entries met the requirements of the business records exception to the hearsay rule, and they were pathologically germane to the diagnosis or treatment of Teonna Boyce. In light of our holding and the

subsequent procedural disposition of the case, we need not, and thus do not, address the second issue.

## I.

On November 12, 1992, sometime before 7:03 a.m., Joyce Boyce, the appellant's biological mother, was admitted to the University of Maryland Hospital for an emergency c-section. The c-section began at 7:03 a.m., and the appellant was delivered at 7:06 a.m. She did not have a heartbeat at birth, was having difficulty breathing, and her Apgar scores were low (0 at one minute, 3 at 5 minutes, and 6 at 10 minutes).[2] The appellant had a breathing tube inserted, was placed on a ventilation machine, and was admitted to the Neonatal Intensive Care Unit ("NICU"). Among other disabilities, the appellant currently suffers from cerebral palsy, mental retardation, and developmental delay. Apparently, a placental abruption (a premature separation of the placenta from the uterus) created the need for the emergency c-section and caused her disabilities.

On August 20, 2002, the appellant filed with the Health Claims Arbitration Office of Maryland a medical malpractice action against UMMS. She subsequently waived her right to arbitration in accordance with Maryland Code (1973, 2006 Repl.Vol.), § 3–2A–06B(b) of the Courts and Judicial Proceedings Article [3] and the matter was referred to the Circuit Court

---

2. Apgar score is defined as:

"A system for evaluating an infant's physical condition at birth. The infant's heart rate, respiration, muscle tone, response to stimuli, and color are rated at 1 min, and again at 5 min after birth. Each factor is scored 0, 1, or 2; the maximum total score is 10. *Interpretation of scores:* 710, good to excellent; 4–6, fair, less than 4, poor condition. A low score at 1 min is a sign of perinatal asphyxia [lack of oxygen around the time of birth] and the need for immediate assisted ventilation. Infants with scores below 7 at 5 min. should be assessed again in 5 more min; scores less than 6 at any time may indicate need for resuscitation...." *Taber's Cyclopedic Medical Dictionary* 141 (19th ed.2001).

3. Maryland Code (1973, 2006 Repl.Vol.), § 3–2A–06B(b) of the Courts and Judicial Proceedings Article provides:

for Baltimore City, where the appellant, on August 22, 2003, filed an amended complaint.[4] The amended complaint asserted that the appellant's mother's prenatal evaluations were consistent with a normal pregnancy and with normal fetal development until the evening of November 11–12, 1992.[5] On that day, it asserted further, the appellant's mother, having developed abdominal pain at home, was seen at University of Maryland Hospital at approximately 2:00 a. m. on the morning of November 12, 1992—approximately five hours before her

"(b)(1) Subject to the time limitation under subsection (d) of this section, any claimant may waive arbitration at any time after filing the certificate of qualified expert required by § 3–2A–04(b) of this subtitle by filing with the Director a written election to waive arbitration signed by the claimant or the claimant's attorney of record in the arbitration proceeding.

"(2) The claimant shall serve the written election on all other parties to the claim in accordance with the Maryland Rules.

"(3)If the claimant waives arbitration under this subsection, all defendants shall comply with the requirements of § 3–2A–04(b) of this subtitle by filing their certificates at the Health Care Alternative Dispute Resolution Office or, after the election, in the appropriate circuit court or United States District Court."

Subsection (d)(1) prescribes when a waiver of arbitration must be filed, "not later than 60 days after all defendants have filed a certificate of qualified expert under § 3–2A–04(b) of this subtitle." Section 3–2A–04 (b)(1)(i) prescribes the time frame in which a certificate of qualified expert is to be filed, "90 days from the date of the complaint."

4. The appellant's mother, Joyce Boyce, filed the original complaint on behalf of her minor child. On August 20, 2003, pursuant to Maryland Code (1974, 2001 Repl.Vol.), § 13–201(b) of the Estates and Trusts Article, the Circuit Court for Baltimore City appointed Tina A. Hall, Esquire, as guardian of the property of Teonna Boyce. Thus, there was a need to amend the original complaint.

Maryland Code (1974, 2001 Repl.Vol.), § 13–201(b) of the Estates and Trusts Article provides:

"*Appointment of guardian.*

    \*       \*       \*       \*       \*       \*

"(b) *Minors.*—A guardian shall be appointed if the court determines that:

"(1) A minor owns or is entitled to property that requires management or protection; or

"(2)Funds are needed for his support, care, welfare, and education and protection is necessary or desirable to obtain or provide funds."

5. Joyce Boyce was approximately 39 weeks into her pregnancy at the time of Teonna's birth.

emergency c-section. Additionally, the complaint alleged that, even though her mother was having abdominal pain and was near the end of her term, she stayed at the hospital for several hours without fetal monitoring, fetal ultrasonography, or obstetric evaluation being ordered. In other words, the appellant alleges that, after her mother initially made contact with a hospital medical employee at approximately 2:00 a.m., she was not seen or treated by the hospital staff until approximately 6:45 a.m. According to the appellant's complaint, the hospital's actions (or inactions) did not comply with the requisite standard of care and were the direct and proximate cause of the appellant's aforementioned disabilities resulting from the placental abruption.

The appellee disputed the appellant's version of events. Specifically UMMS asserted that Joyce did not arrive at the hospital until minutes before 6:45 a.m. on November 12, 1992, when she was taken directly to labor and delivery. Simply put, UMMS asserts that it did not become aware of Joyce's difficulties until she arrived at the hospital shortly before 6:45 a.m. (not the approximately five hours earlier alleged by Teonna) and that it complied with the requisite standard of care once it became aware of Joyce's situation.

The parties agreed that liability was dependent on one factual issue—when the appellant's mother presented and was treated at the hospital, *i.e.* whether she was in the hospital for approximately five hours without treatment or whether she arrived just prior to being taken directly to labor and delivery-, which would be resolved by a jury. Thus, all other facts having been stipulated, the jury was asked to answer the following question:

> "Do you find, more likely than not, that Joyce Boyce waited in the University of Maryland Emergency Room for approximately five to six hours without treatment until she was taken to Labor and Delivery at approximately 6:45 a.m.?"

On the evidence admitted, the jury answered "No."

Prior to the commencement of the liability phase of the trial, UMMS filed a motion *in limine* seeking to exclude two

entries in Teonna's medical record and any testimony about the entries from, as relevant to this case, the appellant's mother or the doctors who made them. The basis for the motion was the appellee's contentions that the entries were inadmissible double hearsay that did not fall within an exception to the hearsay rule, that they were not pathologically germane, and that the appellant's mother's own testimony contradicted the notes.

The first disputed entry was made by the attending neonatologist, Dr. Renee Fox, at 4:45 p.m. on November 12, 1992. It read:

"Mother apparently developed abdominal pain at 2 a.m. Reportedly seen by Family Practice. Returned to ER and reevaluated and brought to Labor and Delivery and fetal heart rate less than 100." [6]

The second disputed entry was made by third-year resident, Dr. Kevin Seymour, who wrote:

"Mom reported to be seen in ER around 2 a.m. for abdominal pain, evaluated, discharge, returned and referred to OB. Where fetal HR found to be much less than 100 necessitating a stat C-section." [7]

At her deposition, Dr. Fox testified that she had no firsthand information regarding the admittance of the appellant's mother. When asked to explain the above quoted entry, Dr. Fox initially stated that it was a history, after which the following exchange occurred:

"Q. Okay. Let's go to your next sentence. 'Mother apparently developed abdominal pain at 2 a.m.' Do you know where you obtained that information?

"A. No.

---

6. Each of these entries was handwritten by each doctor using a slightly different type of shorthand which does not translate well into print.

7. Dr. Seymour estimated, based on the location of his entry in relationship to other entries in the appellant's medical chart, that he made the entry sometime around 5:00 p.m. on November 12, 1992.

"Q. You don't know if you read it somewhere in the medical record?

"A. I—I suspect that I was told it on rounds.

"Q. And why do you suspect that?

"A. Because I typically do not go back to the mother's medical record personally. I rely on the data that is provided to me by residents.

"Q. So when you write your note, you are, just as you said, relying on information that's provided to you, and you don't go back to verify it in any way?

"A. I do at times when—when I don't have the information.... I would have had to walk someplace else, pull up her [Joyce's] chart ... I know that I did not do that very often, unless I had—you know, somebody hadn't bothered to do their job. My job is to supervise residents and ensure that they get information.

. . .

"Q. And [the residents] acquire [this kind of history] from what source?

"A. They acquire it—typically, they acquire it from an obstetrical resident telling them something."

The rest of Dr. Fox's deposition testimony regarding the above quoted portion of her entry is substantially the same, explaining how she most likely gathered the information for the entry in the medical record from forms arriving in the NICU or from Dr. Seymour.

At his deposition, Dr. Seymour testified, as relevant:

"Q. Now, I understand that residents perform rounds with the attending. Can you describe what that process was like in [19]92?

"A. For each infant in the NICU, we would go around and discuss what had happened the night before, in order to pass the information so that we would have continuity of care. The rounds would include the attending, the residents that were assigned to the NICU, the nurses, the residents

that were on call the night before, and usually NICU fellows, both the one that's there during the day and the one that was on call the night before.

"Q. Okay. And, during those rounds, who would be, if you will, presenting the patient? Would the attending be doing the presenting or would the residents be doing it?

"A. Usually, it's the residents doing the presenting or the NICU fellow.

. . .

"Q. Assuming the baby arrives sometime between 7:00 and 7:30 [a.m.], would your rounds taking practices have changed any for that child, in all likelihood?

"A. In all likelihood, if the child showed up while rounds were due to begin, the procedures may have been different.

"Q. Ho w would they have been different?

"A. The rounds may have continued for the rest of the patients, with—some of the physicians may not have been in those rounds. They would have been assigned to care for the new baby. And then, ordinarily, if it's a patient that comes—again to the best of my knowledge. If it's a patient that came during rounds, that would often be the last patient, so that the folks would have a chance to stabilize the baby and gather some information.

"Q. But still the baby would be part of the rounds process, eventually? "A. That's correct."

Dr. Seymour was then asked about his recollection of his discussion with Dr. Fox regarding the appellant's admission to the NICU and the quoted entry he made in her medical record:

"Q. Well, at the time you were speaking and discussing with her, would she have the note in front of her to review?

"A. No. It would have been the speaking and discussing was done prior to the writing of the note.

"Q. Would you have discussed the patient's history with her as well? The history you obtained?

"A.   I cannot recall in this instance.   The history would have been obtained through the report that we received. So, we may have received the history at the same time together.

"Q.   What report would you have received—

"A.   This would have been the rounds.

. . .

"Q.   Okay. Would you agree with me that Dr. Fox's history is different, in some respects, than the history you recorded?

"A.   I would agree.

. . .

"Q.   Would it have been a standard practice of yours, if you obtained a different history than another health care provider, especially [one] that your attending had obtained, to point that out to your attending?

"A.   The history again, for a NICU baby, is a little different.   Because, again, you can't obtain the history from the child itself.   So, the history is often second or third hand obtained on rounds.   And the urgency of the care may require that we [would] be just taking care of the baby, without having obtained a complete history as to the events prior to birth.

. . .

"Q.   Have you ever obtained a history, for a NICU patient, from a mother?

"A.   I would have to say yes, but it was not a frequent occurrence.

"Q.   On those instances, when you obtained a history directly from the mom, what language did you use to document it?

"A.   I don't understand.   Oh, what—how did I say?

"Q.   Did you say mom reported?

"A. If I—right. If my reading of that line, looking back on it from all these years, and knowing how I write and what I would have written, as I look at it, if I had received it directly from mom, I think I would have said; mom reported being seen in the emergency room, as I would have put it more directly from mom. By my reading, [']mom reported to be seen['], tells me that I [got] [ ] that [information] [ ] from staff.

"Q. Where are the places that you would obtain a history from, on a NICU patient? Or, when I say the places, let me be more precise. Whom would you ordinarily obtain histories from?

"A. It's often a synthesis of information obtained from the residents on rounds. The nurses made some report[s]. There may have been some paperwork from upstairs that came down as well. But it would have been residents and nurses.

"Q. All of whom have the responsibility to go and take an accurate history?

"A. Not all of whom. Because again, depending on where they are in the chain, sort of coming from OB down to the NICU, they may have heard it from the OB. The NICU nurses may have gotten [a] report from the OB nurses. So, they would not have had direct contact.

"Q. But we can agree, at the University of Maryland hospital, that the health care providers, who would be taking and passing along, and/or passing along history information, have an obligation to initially take it correctly and pass it along accurately?

"A. That's correct."

Answering the appellee's motion *in limine,* the appellant argued that the entries were business records and, thus, fell within the exception to the hearsay rule for business records. In support of her argument, she submitted an affidavit from Dr. Marcus Hermansen, the director of the NICU at Southern New Hampshire Medical Center and an associate professor of

pediatrics at Dartmouth Medical School. With respect to the two disputed entries, Dr. Hermansen opined:

"It [is] remarkable that anyone would claim that such information is not pathologically germane to the diagnosis and treatment of a newborn in Teonna's condition.

. . .

"In assessing a diagnosis and determining the proper course of treatment of a newborn in Teonna's condition it is helpful to know approximately when the mother's abdominal pain began, what medical treatment, if any, was sought at that time, and from whom, whether and when an evaluation of the condition had occurred, and by whom, whether the mother (and thus the unborn baby) were treated, whether they were kept for monitoring at the hospital or released, what happened upon return to a health care provider and the baby's condition at that time.

. . .

"None of the information contained in [the quoted entries] is extraneous to the medical inquiry in diagnosing and treating a newborn in Teonna's condition."

The appellant's mother also testified on deposition. At that deposition, she testified that, beginning in month seven of her pregnancy, she had occasionally had pain in her lower abdomen and legs. She also testified that she visited Dr. Robinson at the Maryland Family Practice on November 11, 1992, the day before Teonna was born. She had no pain during the visit, she asserted. When she got home from the Family Practice Clinic, the pain returned, then eased, and then got progressively worse as the night continued. She stated that she was able to fall asleep for a period of time, but around 10:30 p.m., she got up to use the bathroom, at which time, she experienced pain that reminded her of the labor pains she experienced when her other, older children were born. The appellant's mother testified that she woke up her family and they walked to her mother's house, arriving around 11:30 p. m.

A friend, whom the appellant's mother called, picked up her and her husband and drove them to the hospital. She stated that, upon her arrival at the hospital, at around 12:30 a.m., a nurse who was leaving the hospital, asked her whether she needed a wheelchair, and, upon being told that she did, went back inside and brought one out. According to the appellant's mother, the nurse took her into an examination room and performed a vaginal exam to determine the extent of Joyce's dilation. The nurse informed her, she said, that she was not dilated and went to get a doctor.

From this point on, the appellant's mother's testimony, while in conflict with the statement of facts in the appellant's original complaint, is consistent with the appellant's amended complaint. At her deposition, the appellant's mother testified that no one else on the hospital staff examined her and that she did not see a member of the staff for another five to six hours until she was rushed to the delivery room for the emergency c-section (her deposition testimony was consistent with the amended complaint on this point). The original complaint stated that, after arriving at the hospital around 2:00 a.m., "Ms. Boyce was reassured by Defendant and sent home.... Ms. Boyce returned to University Hospital a few hours later...." UMMS asked Joyce about this discrepancy at her deposition:

"Q. Miss Boyce, when you originally filed suit, you alleged that you had come to the hospital at about 2 a.m. but were sent home and then came back. But, today, it sounds like you came to the hospital about 12:30, weren't sent home but just didn't get any care. Which version is correct?

"A. I was, I never left the hospital once I went there. I never left the hospital.

"Q. Okay. So you were not sent home after presenting to the hospital.

"A. No.

"Q. You just stayed there and nobody came to treat you.

"A. Yes."

On the day of the liability phase of trial and prior to its start, the trial judge heard arguments on several motions, including the motion *in limine* filed by UMMS. She granted the motion in limine, ruling in relevant part:

"I have reviewed the deposition testimony of [Doctors] Seymour and Fox in which they testify that the statement[s] related to the mother's treatment, in essence, is not pathologically germane because it is related to the mother's treatment and they were treating the minor child. I have also reviewed plaintiff's expert witness affidavit.... Dr. Hermanson [ ] points out that at the time of the alleged note, mother and child were one, and he concluded that the information is pathologically germane.

. . .

"In this case, Joyce Boyce's testimony is in conflict with the notes contained in Dr. Fox and Dr. Seymour's records. Joyce Boyce does not confirm that she arrived at 2 a.m. She does not confirm that she was seen at family practice. She specifically says that she never left the E.R. and that she waited either with her husband or alone for medical care.

"It is my view[,] that the fact that the patient disagrees with the accuracy of the note precludes a finding that the note is pathologically germane under the definition of what a pathologically germane statement must be. To reiterate, the definition of a pathologically germane statement[,] that is[,] [ ] that statement must be a statement that falls within the broad range of facts in which a hospital['s] practice[s] are considered relevant. I do not believe that hospital practice would consider relevant statements which a patient specifically disavows and says are not accurate pertaining to her treatment. Moreover, I give little weight to Dr. Hermanson's report [asserting that the statements are pathologically germane] because he does not discuss or seem to be aware in his affidavit that the patient disavows the accuracy of the note...."

. . .

"So, for the reasons that I have assessed, I do not believe that the information in the note fits the definition of a pathologically germane statement because it's contradicted by the patient, because the plaintiff's expert witness was unaware of that fact, I give little weight to his testimony and greater weight to the testimony of [Dr.] Fox and Dr. Seymour who knew that they didn't know the source of the information.

"So, I believe it's unlikely under those facts that they would have given it great weight because, at the time they were treating the baby, they knew that they didn't know who told them about this 2 a.m. report.

"I also find that the information is generally unreliable."

Thus, the two contested entries in the appellant's medical record were excised from the record and the jury was not allowed to consider them. At the conclusion of the trial, the appellant noted this appeal.

## II.

Generally, the standard of review with respect to a trial court's ruling on the admissibility of evidence is that such matters are left to the sound discretion of the trial court and unless there is a showing that the trial court abused its discretion, "its ruling[ ] will not be disturbed on appeal." *Bern–Shaw Ltd. Partnership v. Mayor and City Council of Baltimore,* 377 Md. 277, 291, 833 A.2d 502, 510 (2003), *quoting Farley v. Allstate Ins. Co.,* 355 Md. 34, 42, 733 A.2d 1014, 1018 (1999) (brackets in original). The application of that standard, however, "depends on whether the trial judge's ruling under review was based on a discretionary weighing of relevance in relation to other factors or *on a pure conclusion of law.*" *Bern–Shaw,* 377 Md. at 291, 833 A.2d at 510 (emphasis added). If "the trial judge's ruling involves a pure legal question, we generally review the trial court's ruling *de novo.*" *Id.; Nesbit v. GEICO,* 382 Md. 65, 72, 854 A.2d 879, 883 (2004) (concluding that when a trial court's decision in a bench trial "involves an

interpretation and application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are 'legally correct' under a *de novo* standard of review"), *quoting Walter v. Gunter,* 367 Md. 386, 392, 788 A.2d 609, 612 (2002). *See also Bernadyn v. State,* 390 Md. 1, 8, 887 A.2d 602, 606 (2005) (concluding, in a criminal case, that a trial court's decision to admit or exclude hearsay is not discretionary and that "whether evidence is hearsay is an issue of law reviewed *de novo* ").

██ Under the Maryland Rules, hearsay must be excluded as evidence at trial unless it falls within an exception to the hearsay rule. Rule 5–802.[8] Thus, a trial court's decision to admit or exclude hearsay ordinarily is an issue of law and, as discussed above, we review decisions of law *de novo.*

### III.

### A.

It is not disputed that the two entries, one written by Dr. Fox and the other written by Dr. Seymour, are hearsay.[9] Generally, hearsay is not admissible. *See* Rule 5–802, *supra.* In *Globe Indemnity Co. v. Reinhart,* Judge Digges explained the main reason why hearsay is inadmissible:

> "Among the reasons for excluding hearsay testimony is the inherent uncertainty of its reliability, and the fact that the person stating the thing to be a fact is not under oath and

---

**8.** Rule 5–802 provides: "Except as otherwise provided by these rules or permitted by applicable constitutional provisions or statutes, hearsay is not admissible."

**9.** Rule 5–801:
"The following definitions apply under this Chapter:
"(a) **Statement.** A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion.
"(b) **Declarant. A** 'declarant' is a person who makes a statement.
"(c) **Hearsay.** 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

subject to cross-examination. The purpose of presenting evidence in support of a contention is to establish facts from which reasonable minds form conclusions and render judgments. In a majority of cases these facts are established by testimony of witnesses who have personal knowledge upon the subject, and this testimony is received for the reason that it has the guarantee of reliability."

152 Md. 439, 446, 137 A. 43,45–46 (1927).

Hearsay is admissible, however, if the statement falls within an exception to the hearsay rule. One of the exceptions to the hearsay rule is the business records exception. The business records exception is currently found in Maryland Rule 5–803(b)(6). It reads:

"Records of regularly conducted business activity. A memorandum, report, record, or data compilation of acts, events, conditions, opinions, or diagnoses if (A) it was made at or near the time of the act, event, or condition, or the rendition of the diagnosis, (B) it was made by a person with knowledge or from information transmitted by a person with knowledge, (C) it was made and kept in the course of a regularly conducted business activity, and (D) the regular practice of that business was to make and keep the memorandum, report, record, or data compilation. A record of this kind may be excluded if the source of information or the method or circumstances of the preparation of the record indicate that the information in the record lacks trustworthiness. In this paragraph, 'business' includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit."

Rule 5–803(b)(6).

Prior to this Court's adoption of Rule 5–803(b)(6), a statute controlled the admission of business records and some of our cases interpreting the various versions of that statute are relevant in the case *sub judice*. By enacting Chapter 517 of the Acts of 1929, the General Assembly added Article 35, § 54A to the Maryland Code which, this Court determined, was designed to create a more liberal approach to the admis-

sion into evidence of business records than existed at common law.[10] *State v. Garlick*, 313 Md. 209, 218–20, 545 A.2d 27, 31–32 (1988).[11] We said that the "purpose of the Act is to put an end to narrowness in the use of the familiar rule of evidence that the person whose statement is received as testimony should speak from personal observation or knowledge[.] . . .," *id.* at 220, 545 A.2d at 32; *Bethlehem–Sparrows Point Shipyard v. Scherpenisse*, 187 Md. 375, 381, 50 A.2d 256, 260 (1946), and that the "statute was clearly intended to liberalize the common law rules on the subject." *Morrow v. State*, 190 Md. 559, 562, 59 A.2d 325, 326 (1948). The current, and substantially unchanged, version of the statute is found in Maryland Code (1973, 2006 Repl.Vol.), § 10–101 of the Courts and Judicial Proceedings Article.[12]

---

**10.** Article 35, § 54A provided:

"Any writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall be admissible in evidence in proof of said act, transaction, occurrence or event, if made in the regular course of any business, and if it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter. All other circumstances of the making of such writing or record, including lack of personal knowledge by the entrant or maker, may be shown to affect its weight, but they shall not affect its admissibility. The term 'business' shall include business, profession, occupation and calling of every kind."

**11.** Rule 5–803(b)(6) and Maryland Code (1973, 2006 Repl.Vol.), § 10–101 of the Courts and Judicial Proceedings Article have been applied in both civil and criminal cases. *Jones v. State*, 205 Md. 528, 532, 109 A.2d 732, 735 (1954), *but see Crawford v. Washington*, 541 U.S. 36, 55–58, 124 S.Ct. 1354, 1366–68, 158 L.Ed.2d 177, 195–97 (2004) (holding, in the context of a *criminal case*, that confrontation is the only constitutional way to test the reliability of testimonial evidence). In a *civil case*, such as the present one, we are generally free to rely on our civil *and* criminal cases addressing the application of the business records exception because the protections provided to a criminal defendant are greater than those provided to a civil defendant. We express no opinion on the construction of *Crawford* in relation to Rule 5–803(b)(6) and § 10–101.

**12.** Maryland Code (1973, 2006 Repl.Vol.), § 10–101 of the Courts and Judicial Proceedings Article provides

" § **10–101. Written record.**

■ Ordinarily, "hospital records may be admitted under the business records exception to the hearsay rule, Rule 5–803(b)(6)." *State v. Bryant,* 361 Md. 420, 430 n. 5, 761 A.2d 925, 930 n. 5 (2000); *Scherpenisse,* 187 Md. at 381, 50 A.2d at 260 ("[A] hospital record containing the history of a patient's case is admissible in evidence, whether or not the statements therein were made by the patient himself"); *Beverly Beach Club v. Marron,* 172 Md. 471, 475, 192 A. 278, 280 (1937) (recognizing that a hospital record was admitted into evidence to show that appellee cut his foot on glass). In the past, we have "gone far in admitting the particulars set forth in the history of a patient in a hospital record[,]" *Old v. Cooney Detective Agency,* 215 Md. 517, 524–25, 138 A.2d 889, 893 (1958), and we have "readily permitted the introduction of proper hospital records under the statute." *Yellow Cab Co. v. Hicks,* 224 Md. 563, 570, 168 A.2d 501, 504 (1961); *Old,* 215 Md. at 524, 138 A.2d at 893.

Even prior to the enactment of the statutory business records exception to the hearsay rule, this Court held that hospital records were admissible. In *Globe, supra,* the Court explained why hospital records, in most circumstances, are not subject to the problems associated with hearsay:

"The question here presented is whether evidence represented by the hospital chart contains a sufficient guarantee of its truthfulness. We are of the opinion that it does. It is a record required by the hospital authorities to be made by one whose duty it is to correctly make the entries therein contained. So far as the hospital is concerned, there could

---

"(a) *'Business' defined.*—'Business' includes business, profession, and occupation of every kind.

"(b) *Admissibility.*—A writing or record made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event is admissible to prove the act, transaction, occurrence, or event.

"(c) *Time of making records.*—The practice of the business must be to make such written records of its acts at the time they are done or within a reasonable time afterwards.

"(d) *Lack of knowledge of maker.*—The lack of personal knowledge of the maker of the written notice may be shown to affect the weight of the evidence but not its admissibility."

be no more important record than the chart which indicates the diagnosis, the condition, and treatment of the patients. This record is one of the important advantages incident to hospital treatment, for it not only records for the use of the physician or surgeon what he himself observes during the time he is with the patient, but also records at short intervals the symptoms, condition, and treatment of the patient during the whole time of the physician's absence. Upon this record the physician depends in large measure to indicate and guide him in the treatment of any given case. Long experience has shown that the physician is fully warranted in depending upon the reliability and trustworthiness of such a record. It is difficult to conceive why this record should not be reliable. There is no motive for the person whose duty it is to make the entries, to do other than record them correctly and accurately. On the other hand, there is the strongest reason why he should: First, because of the great responsibility, he knowing that the treatment of the patient depends largely upon this record, and if it be incorrect it may result, and probably will result, in the patient's failure to receive proper surgical or medical treatment, which failure might be followed by serious consequences or even death. Second, the entrant must realize and appreciate that his position is dependent upon the accuracy with which the record is made. Third, as was stated by Tindall, C. J., in *Poole v. Dicas,* 1 Bing. (N.C.) 649: 'It is easier to state what is true than what is false; the process of invention implies trouble in such a case unnecessarily incurred.' "

*Globe,* 152 Md. at 446–47, 137 A. at 46. In *Garlick,* we referred to the above passage stating, "[t]hat basic attitude towards hospital records and business records[,] in general[,] has never really changed." 313 Md. at 218, 545 A.2d at 31.

■ Applying the above stated law—Rule 5–803(b)(6), § 10–101, and our case law—to the case *sub judice* leads us to the conclusion that the two entries should have been admitted. The entries were made contemporaneous with the actual occurrence of the event. Entries made by a doctor or doctors

prior to the end of their shifts or at the conclusion of their shifts are within the meaning contemplated by the words in Rule 5–803(b)(6)(A) "at or near the time." [13]

The appellee spends a great deal of time and effort arguing that the entries should be excluded under 5–803(b)(6)(B), because Doctors Fox and Seymour did not have personal knowledge of the events contained in the entries, which, according to the appellee, created doubt as to the trustworthiness of the entries. This argument runs counter to the purpose of Rule 5–803(b)(6) as well as the history of the Rule, as our summation of that history makes clear.

Were we to affirm the trial court's decision, we would be eviscerating the business records exception as it is applicable in the area of health care. The very purpose of Rule 5–803(b)(6) (and § 10–101) is to carve out an exception to the personal knowledge requirement in order to allow greater admissibility of business records. The commentators support this conclusion. Chief Judge Murphy of the Court of Special Appeals, in his *Maryland Evidence Handbook*, referring to § 10–101, stated that:

"[This] law[ ] represent[s] legislative · recognition that if records are reliable enough for the running of a business[,] ... they are trustworthy enough to be admissible at trial, particularly when one considers the practical difficulty of proving the specific facts contained in many of these records. Where the record is made within a reasonable time after the event it records, it is sufficiently reliable. *It does not matter that the person who actually does the recording may not have personal knowledge of the fact recorded. What matters is that both the 'reporter' and the 'recorder' are required by the business to report and record accurately.*"

Joseph F. Murphy, Jr., *Maryland Evidence Handbook,* § 804, 318 (3d.1999) (emphasis added). Chief Judge Murphy correct-

---

13. Section 10–101(c) uses "at the time they are done or within a reasonable time afterwards."

ly points out that the entire purpose of the business records exception is based on the premise that because the records are reliable enough for the running of a business, in part because of the business duty imposed on the reporter and the recorder, that they are reliable enough to be admissible at trial. This is true *regardless of whether the person who actually did the recording has personal knowledge of the information recorded.* Professor McLain states that the "lacks trustworthiness" portion of the Rule was designed to:

> "[C]odify the rules of *Aetna Casualty [ & Sur. Co. v. Kuhl,* 296 Md. 446, 453–55, 463 A.2d 822, 826–27 (1983) ] and *Weishaar [v. Canestrale,* 241 Md. 676, 686, 217 A.2d 525, 531 (1966) ]. These rules are more widely known as the rules of *Johnson v. Lutz,* 253 N.Y. 124, 170 N.E. 517 (Ct.App.1930), that the business records exception *does not embrace statements by persons outside the business, because those persons are under no business duty to record or transmit information truthfully,* so that their statements lack a circumstantial guarantee of trustworthiness, and *Palmer v. Hoffman,* 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), that the business records exception *does not embrace self-serving records, made in anticipation of litigation, which lack circumstantial guarantees of trustworthiness.*"

Lynn McLain, *Maryland Rules of Evidence,* Rule 5–803(b)(6), § 4(*q* )(i), 237 (2nd ed.2002) (emphasis added). Thus, according to Professor McLain, the "lacks trustworthiness" portion of the Rule was only intended to exclude self-serving records and statements made by individuals not bound by a business duty to transmit information truthfully. The entries in the present case fall squarely within the circumstances described by Chief Judge Murphy and, on this record, do not run afoul of those described by Professor McLain. Therefore, we conclude that the two entries contained in the appellant's medical records fall within the ambit of Rule 5–803(b)(6).

Moreover, according to both Doctors Fox and Seymour, the information regarding the admission of the appellant's mother, to the best of their recollection, came from someone with personal knowledge of Teonna's history. This testimony is

consistent with the requirements of Rule 5–803(b)(6)(B). In Dr. Fox's case, she believed the information contained in her note came from Dr. Seymour. In Dr. Seymour's case, he believed that the information came from multiple people within the hospital family or from written reports from Obstetrics. If there was any doubt in the trial court's mind as to the reliability of the entries stemming from the doctors' lack of personal knowledge, the proper course was to admit the records and allow the parties to put on evidence attacking and supporting the credibility of the process by which the information for the two entries was gathered. *See* § 10–101(d) ("lack of personal knowledge of the maker of the written notice may be shown to affect the weight of the evidence but not its admissibility").

Both doctors stated that the methods by which they gathered the information for their entries were consistent with how that type of information was collected for that type of entry in the NICU at UMMS in 1992. *See* Rule 5–803(b)(6)(C). Moreover, and perhaps most important, Dr. Seymour pointed out that any history taken of a NICU patient will always amount to hearsay because it can never come from the infant and will often come from the Obstetrics doctors or nurses, or even from the mother or her records. Dr. Seymour also testified at his deposition that it was the duty of health care providers at UMMS to accurately keep these records. There is every indication that these entries were made in the normal course of business and that it was UMMS's standard practice to make and keep these type of records. There certainly is no implication, or indication, that the records were falsified, tampered with or in any other way altered. Therefore, the two statements fall within Rule 5–803(b)(6)(A)–(D).

Our analysis, however, does not end here. We still must address the trial court's ruling that the two entries in the medical record were unreliable. It appears that the trial court based its finding on the fact that the doctors lacked personal knowledge of the information contained in the entries. We have already addressed that issue, along with the effect of the appellant's testimony conflicting with the entries,

concluding that neither prevented an entry from being a business record.

The appellee asserts that the trial judge was correct in finding that the entries should be excluded because they are "100% wrong according to" the deposition testimony of the appellant's mother. It argues that this conflict indicates a lack of trustworthiness which requires the entries to be excluded under Rule 5–803(b)(6). We are not persuaded.

The two entries and the appellant's mother's testimony tend to show that she was at the hospital sometime before, or at, 2:00 a.m. on November 12, 1992. This fact, if believed by the finder of fact, is significant to the appellant's case. What is open to debate is what occurred, if anything, with respect to her treatment between approximately 2:00 a.m. and shortly before 6:45 a.m. on that morning.

We agree that there are discrepancies between the entries and the testimony of the appellant's mother, but we do not agree that the records are in direct conflict with the appellant's mother's testimony or that the inconsistencies are an indication that the entries lack trustworthiness within the meaning of the Rule. There are a number of potential reasons why her testimony might conflict with the entries in Teonna's record. Not the least of those conceivable reasons is the fact that the deposition was taken approximately ten years after the event. Even if we did agree that the appellant's mother's testimony was in direct conflict with the entries, that would not preclude, even if it would not be irrelevant to, their admissibility. *See* § 10–101(d).

We are convinced that our adversarial system of justice is better served by leaving the explanation of any discrepancies between the entries and the appellant's mother's testimony to skilled attorneys and the resolution of those potentially conflicting facts to a jury. We are equally convinced that by removing the task of explaining conflicting evidence from the hands of the parties and their attorneys and by preventing evidence vital to the appellant's case from reaching the jury, the trial court erred when it granted the motion *in limine.*

## B.

Despite our general tendency to permit the admission of hospital records, "there have [ ] been some hospital records (or more precisely some entries within those records) that have been objectionable or found to have been inadmissible." *Garlick,* 313 Md. at 220, 545 A.2d at 32; *Dietz v. Moore,* 277 Md. 1, 7, 351 A.2d 428, 433 (1976) ("[E]ven though a particular hospital record is not barred from evidence as hearsay, it may be that some or all of its contents are open to objection on other grounds"); *Old, supra,* 215 Md. at 524, 138 A.2d at 893 ("This is not to say that everything in the record is admissible"). When addressing the issue of whether an entire medical record is admissible, generally, we have adhered to the rule that "statements in a hospital record must be 'pathologically germane' to the physical condition which caused the patient to go to the hospital in the first place." *Yellow Cab Co., supra,* 224 Md. at 570, 168 A.2d at 504, *citing Lee v. Housing Authority of Baltimore City,* 203 Md. 453, 460, 101 A.2d 832, 835 (1954); *Shirks Motor Express v. Oxenham,* 204 Md. 626, 635, 106 A.2d 46, 49–50 (1954); *see also Wolfinger v. Frey,* 223 Md. 184, 191, 162 A.2d 745, 749 (1960) (finding that pathologically germane portions of hospital record were admissible). "A 'pathologically germane' statement 'must fall within the broad range of facts which under hospital practice are considered relevant to the diagnosis or treatment of the patient's condition.' McCormick On Evidence, Ch. 32, § 290." *Yellow Cab Co.,* 224 Md. at 570, 168 A.2d at 504.[14] "[F]acts helpful to an understanding of the medical or surgical aspects

---

**14.** An example of a statement that is not pathologically germane is found in *Yellow Cab Co.,* where a trial court excluded a portion of the following statement made by the plaintiff-appellee at a medical clinic:

" ' * * * Got in cab & went to Amos Myers [appellee's attorney] who sent him to a doctor—has reported to Dr. every day, but plaintiff does not know his name * * *' "

224 Md. at 569, 168 A.2d at 504. Only the part of the statement referring to appellee's trip to the lawyer and the referral by the lawyer to the doctor was excluded. *Id.* at 570, 168 A.2d at 504. We affirmed on the grounds that those portions of the statement were not "pathologically germane." *Id.*

of the case, within the scope of medical inquiry[,]" are patho-
logically germane. *Garlick,* 313 Md. at 222, 545 A.2d at 33.
Therefore, entries in hospital records which are pathologically
germane, or relevant to the diagnosis or treatment of the
patient's condition, typically fall within the business records
exception to the hearsay rule.

In the instant case, the trial court ruled that, "the fact that
the patient [Joyce] disagrees with the accuracy of the note
precludes a finding that the note is pathologically ger-
mane...." The trial court placed little weight on Dr. Herman-
son's affidavit stating that Joyce's medical history was patho-
logically germane to unborn and newly born Teonna because
"he d[id] not discuss or seem to be aware in his affidavit that
the patient disavow[ed] the accuracy of the note." The trial
judge then said:

> "I know that, with respect to the pathologically germane
> exception, the source of the information need not be identi-
> fied. However, in this unusual case, the patient [Joyce]
> does not provide information that is consistent with the
> information in the Doctor's notes. It leads me to conclude,
> generally, that the information in the note is unreliable...."

Initially, we note that, generally, the pathologically germane
test has nothing to do with reliability of the hospital record.
The reliability test is designed to prevent unreliable informa-
tion, *i.e.* information recorded in a hospital record for the
purposes of litigation, from being put in front of the fact-
finder. *See* Rule 5–803(b)(6). The pathologically germane
test is designed to prevent creative attorneys from putting
information in front of the fact-finder that may not otherwise
be admissible solely because it is in a hospital record. *See
Yellow Cab Co.,* 224 Md. at 570, 168 A.2d at 504 ("A 'pathologi-
cally germane' statement 'must fall within the broad range of
facts which under hospital practice are relevant to the diagno-
sis or treatment of the patient's condition' ").

As a general proposition, we fail to comprehend how
the medical treatment of the mother of an unborn baby within
hours before delivery is not pathologically germane to the

treatment of an unborn (or newborn) baby. Our general proposition is specifically illustrated, in this case, by Dr. Herman son's affidavit.[15] He stated that, "[i]t [is] remarkable that anyone would claim that such information is not pathologically germane to the diagnosis and treatment of a newborn in Teonna's condition."

Furthermore, contrary to the trial court's ruling, the importance of the two entries to Teonna's treatment, under UMMS's practice, is supported by the testimony of Doctors Fox and Seymour. Both testified to the effect that UMMS's standard practice was for oral and written information to be passed between Obstetrics, where the mother was cared for and where the baby was actually born, and the NICU, where the baby was treated. Dr. Fox testified that, if necessary, she would go to a different ward and look at the mother's chart to make sure the information in the NICU patient's history was accurate. Dr. Seymour stated in his testimony that, as part of his history taking duties, he had, on occasion, spoken with mothers and regularly gathered information from Obstetrics doctors and nurses to obtain a history on a NICU patient. It seems self-evident that, by its practice, UMMS considered the history of the mother relevant to the diagnosis and treatment of NICU patients. If that is not the case, why would information ever be passed from Obstetrics to the NICU? Why else would Doctors Fox and Seymour ever concern themselves with the history of a mother of a NICU patient? We conclude that the trial court erred in finding that the two entries in

---

**15.** The trial court essentially ignored Dr. Hermanson's affidavit "because he does not discuss or seem to be aware in his affidavit that the patient disavows the accuracy of the note." Again, we are not of the opinion that the appellant's mother's deposition testimony directly contradicted the entries, but even if it had, that alleged contradiction had nothing to do with whether Joyce's treatment, or lack thereof, was pathologically germane to Teonna's treatment or diagnosis. Any conflict between Joyce's testimony and the factual scenario which was the basis for the affidavit should have been addressed by the parties to a jury at trial, not by the Circuit Court in a pre-trial motion.

question were not pathologically germane to Teonna's treatment under UMM S's practices.[16]

## IV. Conclusion

For the foregoing reasons, we hold that the trial court erred, as a matter of law, by excluding two entries made by UMMS in Teonna Boyce's medical records on the grounds that they were hearsay. The entries met the requirements of the business records exception to the hearsay rule, *see* Rule 5–803(b)(6); § 10–101 of the Courts and Judicial Proceedings Article, and they were pathologically germane to the diagnosis or treatment of Teonna Boyce. As a result of our resolution of the first question presented, it is not necessary to address the second question.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED. CASE REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.**

---

**16.** The appellee argues that even if we find that the exclusion of the notes was improper, appellant has not demonstrated prejudice, and that the exclusion was harmless error not warranting reversal. Under the circumstances described above, we are unable to conclude that the error was harmless. *See In re Yve S.,* 373 Md. 551, 616–18, 819 A.2d 1030, 1068–69 (2003) (discussing the parameters this Court has established for finding harmless error).