## BAMA, INC. ET AL. *v.* ANNE ARUNDEL COUNTY, MARYLAND

[No. 286, September Term, 1982.]

*Decided November 5, 1982.*

The cause was argued before Lowe, Bishop and Garrity, JJ.

*David A. Simison,* with whom were *Solomon & Messinger, P.A.* on the brief, for appellant Bama, Inc. *Laurie R. Bortz,* with whom were *Howard G. Goldberg* and *Smith, Somerville & Case* on the brief, for appellant Fidelity and Deposit Company.

*Karen Alexa Murphy, Assistant County Solicitor for Anne Arundel County,* with whom was *Steven P. Resnick, County Solicitor for Anne Arundel County,* on the brief, for appellee.

Lowe, J., delivered the opinion of the Court.

Appellant Bama, Inc., is a developer who agreed to improve a road adjoining its development and to donate 15 feet of land to widen it. This agreement was imposed by appellee Anne Arundel County as a condition for approving the right to develop. Appellant Fidelity and Deposit

Company of Maryland (F & D) guaranteed Bama's performance by issuing to the County a performance bond in the amount of $30,000.

The suit by the County in the Circuit Court for Anne Arundel County upon default demands judgment in that amount. Appellants defend by claiming that they were forced to participate in an illegal contract in order to obtain a legal right to proceed with development. The Public Works Agreement, upon which the County here relies, was executed by Bama and the County on October 10, 1978, but was expressly predicated upon a Subdivision Agreement entered into on April 4, 1977. These dates are significant because the County expressly relied upon two ordinances, one of which was enacted on July 18, 1978,[1] as its authority to compel Bama to improve an existing road as a condition for subdivision approval. The ordinance referred to as Section 13-121 (c), which is the only clearly expressed authority to impose such condition, was not enacted until after the condition was imposed and agreed to by Bama on April 4, 1977.

In addition to general issue pleas, appellants filed a special plea of ultra vires "because Anne Arundel County did not have the authority to demand the promises made by Defendants as a condition for subdivision approval." They also filed a unique counterclaim seeking "declaratory relief", asking the court to declare the Public Works Agreement and the bond securing it to be null and void, because it took Bama's property without compensation and required it to do more work than is constitutionally authorized. Because of the obvious incongruity of using the declaratory judgment procedure to counterclaim, we will not address that issue but will treat the constitutional issue as a defense entered under the general issue plea.

- prelude -

Before addressing the merits of the case appellants complain that their motion to dismiss should have been granted at the end of the County's case, because no evidence had been

---

1. Bill No. 54-78 adopted July 18, 1978, effective September 1, 1978.

submitted that the bond upon which the County had sued existed, nor that if it did exist, that its provisions precedent to recovery were complied with by the County. Rather than ruling on the merits of the motion, the judge reopened the County's case not once but twice and permitted the evidence to be introduced, then denied the motion.

"COURT: Well, I'll entertain a motion to reopen, Mr. Court.

MR. COURT [Asst. Co. Solicitor]: I didn't hear what you said.

COURT: I'll entertain a motion to reopen.

MR. COURT: I move to reopen the case in order to submit copies of the original agreement, Your Honor.

COURT: Alright. Granted."

The County then called the Assistant Chief of the Inspection Division of the County Department of Public Works, through whom it introduced the Public Works Agreement along with the bond and again closed its case.

Appellants renewed their motion to dismiss, this time because written notice of default (as required by the bond prerequisite to forfeiture) had not been submitted in evidence. Acknowledging its importance, the court again permitted the County to reopen and offer the evidence.

"COURT: Well, it would seem to me to be appropriate that the notice would be put in as I would wonder if you could hold the bonding company without the notice in view of the terms of the public works agreement.

MR. COURT: Well, we feel we could but we feel we have notified them and therefore they are . . . they not only were notified, but they failed to respond.

COURT: Uh-huh. Well, I think it would be appropriate if the notices exist that we put them in, Mr. Court.

> "MR. COURT: If the court please, I would move to put Mr. Richardson back on the stand."

Without waiving its general objection predicated upon its motion to dismiss, appellants agreed to waive the need for any testimony to introduce the correspondence.[2]

> "MR. SIMISON [Attorney for Bama]: Your Honor, if you're inclined to allow the plaintiff to reopen their case to put those exhibits in, I would have no objection to them just going straight in without the need for testimony."

Implicitly and expressly in their briefs appellants argued that the invitations to reopen were abuses of discretion, the prejudice from which is apparent since the case could not have proceeded past the motion to dismiss absent that sua sponte elicitation. Although by putting on evidence after their motion was denied, appellants waived the motion, *Moon v. Weeks,* 25 Md. App. 322 (1975), because of the appearance of this unsolicited act by the court, we will address the issue of discretionary abuse. The court created the appellants' dilemma of whether to rest upon the apparent abuse or proceed to defend on the merits.

Appellants cry "foul", and with some justification we think. It is quite enough of a burden to fend off a government assault with such substantial resources at its disposal, but the effort becomes frustrating when the arbiter which is housed and partially sustained by the County, suggests and approves the procedure to overcome the errancy of the government's oversight. But the act was discretionary, if not recommended. The right to reopen here, however, should have been looked upon askance, especially because of its compromising suggestibility and the appearance of judicial

---

2. This restricted waiver is certainly not a general approval as suggested by appellee whose brief recites that:

> "Again, after discussion with counsel and *at the express suggestion of Appellants' counsel,* the court reopened the case to allow the notices of default to be placed into evidence." (Emphasis in original).

propriety is as important to the public as the fact of it is to the parties.

- the right to reopen -

Poe's *Pleading and Practice* (6th ed.) points out that the application to reopen a case once closed, for further testimony of evidence, is not looked upon with favor and, in face of objection, is seldom granted because of its liability to abuse. *Id.* at Vol. 3, § 288 A, p. 507 (1975). Ironically, however, most cases prior to 1947, held the right to permit a party to reopen to be a discretionary exercise "from which no appeal lies." In 1947, in *Brown v. Bendix Aviation Corp.,* 187 Md. 613, 620, the Court of Appeals addressed the issue by dicta, and for the first time implied that the rule of discretion could admit an exception. Subsequently, *Willey v. Glass,* 242 Md. 156, 163 (1966), expressly qualified the suggestion of jurisdictional review by interjecting the adverb "ordinarily", leaving for the first time, an expressed loophole for appellate courts at least to review the trial judge's exercise of discretion.

But prior even to *Brown,* in *Guyer v. Snyder,* 133 Md. 19, 22 (1918), while repeating the "no appeal will lie" language, the Court hedged the appellate review proscription. It cited the section in Poe suggesting that reopening was not favored, then sought to justify its affirmance of the lower court (which had permitted a reopening to introduce evidence in the case) rationalizing that the evidence admitted could not have prejudiced appellant's case.

> "The nature and character of evidence set out in the exceptions and which was permitted to be introduced could not have prejudiced the claimant's case, and he was not thereby injured by its admission.
>
> Without stopping to review the testimony or stating it in detail it is sufficient to say the case was one that presented a state of facts for the consideration of the jury and not for the Court to decide or determine, as a matter of law." *Id.* at 22.

20

Implicitly the Court of Appeals seemed to express a proposition contrary to its bootstrap justification for affirmance: that if the evidence belatedly permitted *were* determinative as a matter of law its admission might have been prejudicial, suggesting to permit it could have been an abuse of discretion.

But neither before nor since have we found the chink in the armor of discretion suggested by *Guyer v. Snyder;* and, although *Brown* acknowledged a likelihood of the suggested result by noting that in equity here, and in other jurisdictions, the rule allowing appellate review was more liberal, it promised little hope of future light, nor did *Willey* through the "ordinarily" qualification of the "no appeal will lie" language. A perusal of our equity cases suggests that the exception to the no-appellate-review rule is couched in such broad judicialese that hope is slim for one who objects to prevail on appeal. The exception there indicated that there is an abuse by a chancellor only "where his action is arbitrary and the rights of some of the parties are improperly affected." *E.g., Shook v. Shook,* 213 Md. 603, 612 (1957); *Bradford v. Eutaw Savings Bank,* 186 Md. 127, 131 (1946); *Bailey v. Bailey,* 186 Md. 76, 80 (1946). Apparently Poe's observation that an application to reopen is looked upon with disfavor because of its liability to abuse was directed to the nisi prius level. It obviously was not suggestive either of our right to review law or our equitable standard of review on appeal.

If a distinction between law and equity exercises of discretion existed in this field, for purposes of our right to review, and/or our standard of review, as suggested in *Brown,* it seems no longer extant. At law appellate review has expressly evolved from no right to review to an expressed right to review subject to the ordinary abuse of discretion standard, *Telak v. Maszczenski,* 248 Md. 476, 495 (1968). What that standard entails, however, is still somewhat unclear. By citing both a law case, *Telak,* and an equity case, *Nicholas v. Owrutsky,* 230 Md. 60 (1962), for the ordinary review for abuse of discretion principle, we seem to have amalgamated into the law side, what Judge Henderson called in *Brown, supra,* the more liberal rule in equity, *i.e.,*

that reversal is warranted only when the decision to reopen or not was arbitrary and some of the parties were improperly prejudiced. *Embrey v. Holly,* 48 Md. App. 571, 602 (1981), *rev'd,* in part, *on other grounds,* 293 Md. 128 (1982).

The case at bar suggests a degree of arbitrariness by the court twice inviting applications to correct determinative omissions of evidence and twice granting the extraordinary relief. That the appellants were prejudiced is unquestioned. Without the bond, the suit predicated upon it was lost; without proof of notice of default as required by the bond, there was no case as the County had brought it. The question then is whether the prejudice was improper. Unfortunately for appellants, the plethora of cases upon this "seldom granted" relief, suggest the contrary.

In *East Balto. Transfer Co. v. Goeb,* 140 Md. 534 (1922), the proof of ownership and operation of a truck which struck the plaintiff was permitted. Despite the language in *Guyer* four years previous, suggesting that belated admissions of evidence determinative as a matter of law might be prejudicial, the Court of Appeals acknowledged that the admissions of "... necessary evidence for a proper consideration of the case ... [were] entirely within the discretion of the court ...." and that the court's action in that respect was "not reviewable by this Court and is no ground for an appeal." 140 Md. at 537.

In *Brown* the same facts were suggested to the court, *i.e.,* there was no evidence of what car struck the plaintiff or who drove it. Here, however, the proffer was made to recall the driver who was still present. The trial court denied the motion to recall and granted the motion for directed verdict. Although the Court of Appeals discussed the old cases saying no appeal will lie, and implied that there may be in a proper case an exception to this rule and that review may be granted, it did not decide the issue. It held that even without the proffered evidence there had been sufficient evidence introduced to submit the case to the jury and, therefore, reversed without further enlightening us. It seems unlikely that the plaintiff would make the same mistake on retrial.

Assuming as argued by appellee here, that the judge believed that the County was somehow misled by the stipulation of counsel that no work had been done under the Public Works Agreement, we cannot hold his action arbitrary nor the insurer and insured "improperly" prejudiced by permitting the County to correct its errancy. Even its insouciance in failing then to prove compliance with the bonding contract was not so egregious that the judge could not permit a second bandaid to be applied to its case.

While courts are in the business of seeking the truth, the officer who decides where the truth lay should be hesitant, however, in suggesting to the procurement officers either where to search for it or how to produce it. Fair play suggests the judge should judge, but it is neither arbitrary nor improper for him to deviate upon occasion when a party may be harmed by an attorney's imbroglio. But that is not the end of the County's problems.

- County authority to impose conditions -

Pursuant to the Public Works Agreement of October 10, 1978, the County required the bond at issue "for completion of the roads and storm drainage facilities." The parties agree that the roads and storm drainage facilities to be completed are those incorporated by reference in the Public Works Agreement as comprised in the Subdivision Agreement of April 4, 1977. It appears that in addition to the agreement to reconstruct the road abutting its proposed development, to which it agreed as a quid pro quo to subdivision development approval, Bama agreed in the October agreement to deed some 15 feet of land on the road to effect the reconstruction. Appellants' second complaint is that appellee's requirement reflected in the April 4, 1977 agreement as a condition for development approval, was ultra vires in that there was neither authority by its County Council to so require, nor was the County authorized by State statute or constitution to enact such authorizing ordinance.

On July 18, 1978 the County enacted under its Title 13 "Planning and Zoning", Subtitle 1, "Subdivisions", Article III, "Procedures for Filing and Processing Subdivision Appli-

cations", three new subsections (indicated by italics) to its Section 13-121 "Street Construction".

"(a) The Subdivider shall provide for the complete construction of streets, curbs, gutters and sidewalks in accordance with the design manual. The developer shall be required to repair damage to county roads, storm drainage, curbs, gutters and sidewalks as a result of grading or construction activities in his subdivision.

(b) *If the general development plan of the County reflects that a highway or road capital improvement will traverse the proposed subdivision, the subdivider shall dedicate the right-of-way to public use and shall pay the proportionate share of the costs of the road improvements as if it were a collector in the subdivision.*

(c) *The subdivider shall improve existing County roads abutting or traversing the subdivision to comply with County standards as set forth in the Department of Public Works Design Manual. If the general development plan of the County reflects future major adjustments to a road abutting or traversing the subdivision, the County may elect to require the subdivider to post funds as his proportionate share of cost of the future improvements in lieu of improving the particular road to County standards.*

(d) *If the subdivider is required by any provision of law to improve a County road and the subdivider demonstrates that he has been unable to acquire necessary rights-of-way outside of his property lines, the County, according to established County policy and law, shall acquire such rights-of-way at the subdivider's expense.*"

Subsections (c) and (d) directly address the facts in this case; however, they were not a part of the law of Anne Arundel County when the Subdivision Agreement (upon which the Public Works Agreement was predicated) was made.

The trial judge recognized that this section was not applicable to this case but recognized another section of the County Code which he decided was both applicable and dispositive.

"In effect in 1977, Anne Arundel County Code § 13-107.2 provides, *inter alia* that:

(a) Where topography or other conditions are such as to make impractical the inclusion of utilities or drainage facilities within streets right of way, perpetual unobstructed easements at least fifteen (15) feet wide for such utilities shall be provided across property outside the street.

(r) In subdivisions that adjoin or include existing streets that do not conform to widths as shown on the general development plan or the street width requirement established in the design manual, *the subdivider shall dedicate additional width along either one or both sides of the such streets* of inadequate width, so as to bring them up to standards, *provided the area to be used for widening is owned by the subdivider or under his control.* (emphasis added)

Section 13-107.3 provides:

(b) Grades of streets shall be arranged to obtain as many building sites as possible at or above the elevation of the abutting street.

(c) Grades of streets shall adhere to the design standards in the design manual and shall not in general exceed those standards . . . .

Although Mr. Elbrick, Jr. testified that he believed that the County's authority to require Bama to bear the burden of road improvements arose from § 13-121, that section did not become effective until September 1978. But this fact does not prove the Defendants' counterclaim, as the sections quoted

above supply the basis for the County's requirements."

We do not agree with the trial judge that § 13-107.3 provides such authority, nor need we look to judicial guides for interpreting legislative intent of ambiguous language to so conclude.[3] We find no fault with the requirement that the subdivider dedicate additional land to bring the existing street to design manual standards as will be seen below.

Section 13-107, however, begins with the words:

"In *designing* a highway, street or road system, the subdivider shall be guided by the following principles:". (Emphasis added).

After setting forth 16 express principles there follows a series of seven subsections before reaching § 13-108, each addressing some principles of design, such as layout, grades, alignment, intersections, alleys and acceptance related to guiding principles for a subdivider "designing" a street or highway. Specifically, section 13-107.3 states:

"(a) Grades of streets shall conform as closely as possible to the original topography and shall be designed to produce useable lots.

(b) Grades of streets shall be arranged to obtain as many building sites as possible at or above the elevation of the abutting street.

(c) Grades of streets shall adhere to the design standards in the design manual and shall not in general exceed those standards. Except that the planning and zoning officer shall have the right to permit steeper grades where such are warranted by unusual topographic conditions."

Significantly, the tenor of the entire context comports with an initial "designing" of a way, not a reconstruction

---

**3.** Appellants contend that we should infer from the passage of § 13-121 that the Council recognized a legislative void and enacted § 13-121 to fill it. Appellee contends that it was a mere recognition of ambiguity and the Council took corrective measures to remove the cloud of uncertainty. Such is the ephemeral nature of judicial interpretative guides to glean legislative intent, which, like the Bible, can be interpreted to the devil's own use.

designing. Equally significant is the express use of the reference to "existing" streets in 107.2 (r) when a requirement is made of a subdivider to enhance "existing" streets. That requirement is limited to the dedication of adjacent land, not to its improvement or reconstruction otherwise. The conditional dedication of land, which is not at issue here, was therefore authorized.

It follows that prior to the effective date of the enactment of new § 13-121, the County had no authority to compel reconstruction of McKinsey Road and could therefore not require a completion bond to guarantee that which it unlawfully required. But even that does not decide the issue.

The County responded to the issue of ultra vires, raised by appellants by further arguing estoppel, waiver and (presumably as to F & D) lack of standing. The judge did not find it necessary to address these issues.

> "The Plaintiff responds to these defenses by challenging the Defendant's standing to raise them, and also alleges estoppel and waiver. By focusing on the lack of merit in the defenses raised by the Defendant, addressing those counterissues raised by the Plaintiff will not be required."

Although we will not reverse the judge's judgment, we will remand for him to inquire into and address these issues. Particularly, it could be most persuasive to determine at what juncture of negotiations appellant Bama questioned the authority of the County to require it to improve the road in question. If it entered the agreement of April 4, 1977, or even of October 10, 1978, recognizing that the issue of the Company's authority was in question, it is comparable to enjoying the favors of a demimondaine before questioning her legal right to be compensated. The same type of declaratory relief it sought by counterclaim here was equally available then, and more appropriately timed.[4] But that is part of the factfinding the trial judge must make and what is persuasive to us need not be to him. It will suffice for us to

---

4. Appellants appear to have failed to comply with Md. Cts. & Jud. Proc. Code Ann. § 3-405 (c) in attacking constitutionality of an ordinance by declaratory relief but the issue was not raised.

permit him to reopen the evidentiary phase of the case once more. Surely he will not be remiss in permitting further evidence on the unanswered issues. Md. Rule 1071.[5]

We agree with the trial judge that the dedication of the designated strip of land next to McKinsey Road was authorized by § 107.2, was not a taking that required compensation, and the authority was given by the Legislature to chartered counties such as Anne Arundel. See *Rockville v. Brookeville,* 246 Md. 117, 131 (1967); *Krieger v. Planning Commission,* 224 Md. 320, 323 (1961). See also in similar regard Annot. 43 A.L.R.3d 862 (1972). The trial judge articulately put it in factual context.

> "The Defendants also claim in defense of their nonperformance under the public works agreement with the County that the County's demands violate provisions of the United States Constitution and Maryland's Constitution. They argue that the County, by requiring Bama to dedicate the widening strip, is taking private property for a public purpose without just compensation. This argument, in effect, challenges the charter sections from which the County derives its authority. The protection of compensation for governmental taking is qualified by the rightful exercise of the police power, bearing a substantial relation to the protection of the public welfare. That qualification is further limited to prevent regulation that "goes too far," so as to be a taking. *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922). That is, where regulation would render the property 'wholly useless, the rights of property

---

5. The issues of estoppel and waiver, of course, should have been addressed preliminarily since they go to the standing of the parties to raise the ultra vires, statutory construction, etc. issues. If estoppel were imposed or waiver applied, the other issues would have been moot because Bama would have been estopped from raising them or would have waived them. Because they are predicated upon factual findings, we cannot decide them on appeal. While it may have been simpler for us to have remanded for the trial court's determination of these issues before addressing the issues raised on appeal, such avoidance would have placed an added burden on the parties as well as the courts. We suggest for the future, however, that the trial judge address issues of statutory construction or statutory authority when they are all raised simultaneously as was done in this case.

would prevail over the other public interest, and the police power would fail.' *Hudson County Water Co. v. McCarter,* 20[9] U.S. 349, 28 S.Ct. 529, 52 L.Ed. 828 (1908).

The dedication of Bama of a 15-foot widening strip is not a taking that requires compensation. The Code provision requiring the dedication of a widening strip specifies that only 15 feet be set aside for this purpose. The dedication of 15 feet does not result in a substantial diminution in the value of Bama's total property, which constitutes McKinsey Woods Section One Addition.

Moreover, Bama is not deprived of every reasonable use to which the 15 foot strip could be put. The dedication of the strip enables Bama to realize the ultimate economic value of the remaining land — the approved subdivision into lots. This Court is not convinced that the County would have ever expended its own funds to widen McKinsey Road had Bama or another developer not requested subdivision approval.

Additionally, the widening of McKinsey Road may prove to be beneficial to Bama as well as the general public and even enhance the value of the remaining land. There has been no showing that Bama will suffer a loss by compliance with the Code provisions."

Finally, appellant has argued that the ordinance authorizing the imposition of the condition of reconstructing the road was not constitutionally valid because it exceeded the County's police powers. We also agree with the trial judge who said that:

"As to the Defendants' claim that the County has further exceeded its police powers by requiring Bama to alter an existing County road outside the property owned by Bama, this Court finds no merit in it. Unlike the bridge or culvert in *Baltimore County v. Security Mortgage,* 227 Md. 234 (1961), which was to be constructed on the land of others

entirely beyond the subdivision boundary of the Defendant therein, McKinsey Road is abutted by the Bama property sought to be subdivided."

But appellant further argued on appeal that the County authority to enact ordinances authorizing existing road reconstruction as a subdivision condition required an express authority under Art. 25A, § 5, *et seq.* which sets forth the express powers permitted to chartered counties such as Anne Arundel. That issue was not decided below, Md. Rule 1085, and we are not inclined to address issues of such impact without full and adequate exposition below. *Cf. Vuitch v. State,* 10 Md. App. 389 (1970). While our initial reaction would be that such authority is as implicit in the planning and zoning authority, § 5 (x), as other conditions relating to the effect of the subdivision on public property, we will not decide such issues on impulse.

Having held that the bond requirement as imposed initially upon the Subdivision Agreement of April 4, 1977, was an ultra vires act by the County—and therefore was not binding as such or as incorporated in the Public Works Agreement of October 10, 1978 — if upon remand the trial court determines that appellants are estopped from raising the defense that the condition imposed in the Subdivision Agreement was ultra vires, the Public Works Agreement of October 10, 1978 (which was executed after the County had enacted the express authorization in Section 13-121) would stand untainted. It would then be necessary to decide on this remand, the express powers issue, if it had been propitiously raised heretofore.

Upon reopening those matters for further evidence and argument on the estoppel issues, the court may also require further exposition of the express powers issue, if that issue was raised previously before the court and overlooked in its opinion. The court may also refuse to respond to that argument if it were not previously raised or if the estoppel determination moots it. Just as appellant may not argue a theory here which was not raised below, our limited remand does not open new vistas for it unless it has previously addressed them to that court.

We will neither affirm nor reverse the judgment of the trial court, but will remand pursuant to Md. Rule 1071 for further proceedings in accordance with this opinion.

> *Judgment neither affirmed nor reversed.*
> *Case remanded pursuant to Md. Rule 1071 for further proceedings in accordance with this opinion.*
> *Costs to be paid by appellants.*