*In Re: The Estate of Sam Duraiswamy*, No. 1758, September Term, 2024. Opinion by Ripken, J.

## TRIAL ADMINISTRATION – COURT'S DISCRETION TO RECEIVE ADDITIONAL EVIDENCE AFTER EVIDENTIARY HEARING

Trial courts have broad discretion to receive additional evidence after a trial or evidentiary hearing. An abuse of that discretion may occur if the court's decision is arbitrary or unfairly prejudicial. Where a trial court reopened evidence before motions for judgment and closing arguments and permitted a previously unidentified party to submit exhibits, present motions, and argue, and where the opposing party had an opportunity to respond to the additional evidence, there was no abuse of discretion.

## EVIDENCE – TESTIMONY – DEAD MAN'S STATUTE – INTERESTED PARTY

Section 9-116 of the Courts and Judicial Proceedings Article to the Maryland Code, in a proceeding by or against an estate, a person who has an interest in the property sought or who has a direct pecuniary and proprietary interest in the outcome of the case may not testify concerning a transaction or statement made by the dead person, unless that witness has been called by the opposite party or unless the testimony of the same transaction or statement has already been given into evidence in the same proceeding. Where the personal representative of an opposing estate filed a claim in the present estate and was a potential distributee of that estate, he had a pecuniary interest in the outcome and was prohibited from testifying regarding statements made by the dead person.

## EVIDENCE – TESTIMONY – DEAD MAN'S STATUTE – NON-INTERESTED PARTY

The spouse of an interested party did not have a pecuniary interest in the outcome of an action simply by virtue of her relationship with the interested party and her testimony concerning statements made by a dead person was not prohibited by section 9-116 of the Courts and Judicial Proceedings Article.

## STANDARD OF REVIEW – FACTUAL FINDINGS – NON-PERSUASION

Appellate review of an orphans' court decision requires deference to its findings of fact, which will not be set aside unless clearly erroneous. If a case involves the application of Maryland statutory and case law, appellate courts must determine whether the lower court's conclusions are legally correct under a de novo standard of review. An orphans' court, as the finder of fact, is entitled to determine the weight and credit of the evidence. Non-persuasion of a fact requires nothing but a state of honest doubt on the part of the trial judge. Where the orphans' court was not persuaded that the evidence demonstrated a common-law marriage was entered into in another jurisdiction, there was no clear error because there was evidence in the record to support the court's factual findings.

Orphans' Court for Montgomery County
Estate No. W108771

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1758

September Term, 2024

_____

IN RE: THE ESTATE OF SAM
DURAISWAMY

_____

Leahy,
Ripken,
Kehoe, Christopher, B.,
     (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Ripken, J.

_____

Filed: April 3, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Sam Duraiswamy ("Decedent") died intestate in 2021. This appeal arises from a decision of the Circuit Court for Montgomery County, sitting as the Orphans' Court, wherein the court determined that Decedent was not the common-law husband of Diane Adams ("D.E. Adams"),[1] also deceased. The Estate of Diane Adams (the "Adams Estate"), appellant, appeals from that decision. The appellees are 1) Kevin McCarthy ("McCarthy"), the personal representative for the Estate of Sam Duraiswamy ("Duraiswamy Estate") and 2) the blood heirs of Decedent (the "Blood Heirs").[2]

The Adams Estate filed a timely appeal and presents the following issues for our review, which we combine and restate as:[3]

---

[1] This case involves several individuals with the same last name. Dominick Adams will be referenced as "D.K. Adams," Sara Adams as "S. Adams," and Diane Adams as "D.E. Adams."

[2] The Montgomery County Board of Education ("the Board") was an interested party in the proceedings before the orphans' court but did not file a brief in this Court.

[3] Rephrased from:

> 1. The court erred when it allowed the Board of Education to remain as an interested party after purported blood relatives were located.
>
> 2. The court erred when it appointed counsel for blood relatives, known and unknown, ordered that the attorney's fees be paid out of the Estate of Mr. Duraiswamy, and permitted counsel for the blood relatives to submit evidence and make argument after the evidentiary hearing on September 29, 2023.
>
> 3. The court erred when it determined the Dead Man's Statute prevented statements made by [Decedent] at the car dealership and [D.E. Adams] at [S. Adams'] bridal shower from being entered into evidence.

I.   Whether the orphans' court abused its discretion in permitting the Montgomery County Board of Education to remain a party to the suit after the Blood Heirs were ascertained and in appointing counsel to represent the Blood Heirs.

II.  Whether the orphans' court abused its discretion in permitting the Blood Heirs to present argument and evidence at the August 2024 hearing.

III. Whether the orphans' court erred in excluding evidence at the hearings.

IV.  Whether the orphans' court erred in its conclusion that the evidence was legally insufficient to establish that Decedent and D.E. Adams were in a common-law marriage.

For the following reasons, we shall affirm the judgment of the orphans' court.

## FACTUAL AND PROCEDURAL BACKGROUND

### *Underlying Facts*

Decedent was born in India in 1943. In the 1970s, he immigrated to the United States, becoming a naturalized citizen in 1976. Decedent worked as an engineer for the Nuclear Regulatory Commission. While there, he met D.E. Adams, and the two began a long-term relationship that spanned several decades.[4] However, the two were never formally married. Decedent died on November 1, 2021, at his home in Gaithersburg, Maryland (the "Gaithersburg House"). D.E. Adams died eight days later at the same house.

---

4. The court erred when it did not admit the Patient Information Demographic Sheet from MedStar Montgomery Medical Center into evidence.

5. The court erred when it found that there was not a common[-]law marriage between [Decedent] and [D.E. Adams].

[4] It is unclear exactly how long Decedent and Adams were in a romantic relationship. However, D.K. Adams testified that he recalls spending time with Decedent and Adams as early as 1986.

2

*Procedural Background*

On November 2, 2021, McCarthy filed a petition for administration of a regular estate with the Register of Wills for Montgomery County. Per McCarthy, he spoke with Decedent soon before he died and was scheduled to meet with him to prepare estate planning documents and, thus, was familiar with "his current financial status and family situation." McCarthy attested that Decedent died intestate, was unmarried, had no children, and was predeceased by his parents, and all his living family was in India. On January 26, 2022, McCarthy was appointed personal representative of the Duraiswamy Estate. The initial inventory valued the estate at over $2.7 million.

In October of 2022, McCarthy filed a motion in the orphans' court for instructions or, in the alternative, to send funds to the Montgomery County Board of Education. McCarthy explained that he had been unable to locate information on Decedent's relatives in India and had not engaged an investigator to seek out heirs at law because of the difficulty in doing so in a foreign country with the limited information available to him. Given that Decedent died intestate, and no heirs had been located, McCarthy asked the orphans' court to find that he had made reasonable efforts and to order the distribution of the balance of the estate to the Board, consistent with section 9-108 of the Estates and Trusts Article ("ET") of the Maryland Code (1974, 2022 Repl. Vol.).[5]

---

[5] That statute provides that a personal representative of an estate "shall pay over or transfer the money or property or its proceeds, as directed by order of court, to the board of education in the county where the letters were granted," if the court finds that the personal representative has been unable to locate any heirs or legatees despite reasonable efforts. ET § 9-108(a).

Alternatively, McCarthy requested that the court instruct him on whether to recognize the Adams Estate as an heir or legatee, either solely or partially, of the Duraiswamy Estate. McCarthy alleged that D.E. Adams died a week after Decedent, and though not legally married, McCarthy noted that D.E. Adams was Decedent's "longtime partner," that she was listed as Decedent's emergency contact on medical forms, and that the two shared a joint Costco membership. McCarthy attached to his motion a copy of a letter from D.K. Adams, which he construed as a request to recognize the Adams Estate as a legatee or heir of the Duraiswamy Estate. However, McCarthy had not discovered any basis supporting the recognition of the Adams Estate as such. He asked the court to hold a hearing on the motion.

*January 2023 Hearing*

The orphans' court held a hearing on the matter in January of 2023. McCarthy appeared as personal representative on behalf of the Duraiswamy Estate, and D.K. Adams appeared as personal representative on behalf of the Adams Estate. The Adams Estate advanced the position that D.E. Adams and Decedent had a common-law marriage in Washington, D.C. The orphans' court continued the case and set the matter for a two-hour evidentiary hearing to address that issue and directed McCarthy to take additional steps to attempt to locate Decedent's relatives in India.

In May of 2023, the Board entered its appearance, through counsel, as an interested party. In August of 2023, the Board and the Adams Estate filed memorandums of law on the issue of the alleged common-law marriage between Decedent and D.E. Adams.

McCarthy filed a statement advising that he took no position on the existence of a common-law marriage.

*September 2023 Hearing*

The evidentiary hearing went forward in September of 2023. As a threshold matter, counsel for the Adams Estate argued that the Board should not be permitted to participate as an interested party because if the court were to find that Decedent and D.E. Adams were common-law spouses, the Board would have no standing. Counsel for the Board responded that the Board remained an interested party under ET section 9-108, given that McCarthy had thus far been unable to locate any blood heirs and the Adams Estate had not been determined to be an heir. The court denied the Adams Estate's motion.

McCarthy proffered to the court that he had made additional efforts to locate Decedent's blood relatives in India, engaging a law firm in India that had likewise failed to locate any family members. McCarthy continued to take no position on the existence of a common-law marriage. He explained that if the court determined that D.E. Adams was Decedent's common-law wife, her estate would be the sole heir. If the court determined that D.E. Adams was not his common-law wife, McCarthy again asked the court to find that he had made reasonable efforts to locate Decedent's family in India and order the balance of the estate to be distributed to the Board.

*Dominick Adams' Testimony*

In its case, the Adams Estate called two witnesses: D.K. Adams and his wife, Sara Adams ("S. Adams"). D.K. Adams testified that though D.E. Adams was his first cousin, she acted as his "surrogate mother[.]" Per D.K. Adams, D.E. Adams and Decedent were

5

together his entire life. His earliest memory of their relationship was in 1986, when he was 4 years old. Between approximately 1986 and 1994, he spent every other weekend with them at a two-bedroom apartment in Washington, D.C. ("the D.C. Apartment") that he believed they shared. He slept in the smaller bedroom, and they slept in the larger bedroom. Decedent and D.E. Adams also took him shopping, to the park, and to museums. He considered them a married couple and thought of Decedent as his uncle.

As D.K. Adams grew older, he began visiting D.E. Adams and Decedent at the D.C. Apartment on Friday evenings but stopped spending the night. He would also visit them at a house in Rockville, Maryland (the "Rockville House"). He recalled that D.E. Adams would spend the week at the D.C. Apartment because it was close to her work and would spend the weekends at the Rockville House with Decedent.

In the late 1990s, Decedent and D.E. Adams began living at the Gaithersburg House. D.K. Adams remembered that they were excited when they moved into that home because it had a barn and a pond. D.K. Adams had his own bedroom at the house.

After Decedent and D.E. Adams retired in the early 2000s, D.E. Adams began spending much of her time at the Gaithersburg House. However, Decedent would stay with her at the D.C. Apartment if they wanted to see a show at the Kennedy Center, visit the zoo, or had medical appointments in the city. D.K. Adams observed that Decedent and D.E. Adams ate dinner together every night, watched television, and engaged in political debates.

In 2008, D.K. Adams began dating his now-wife, S. Adams. He introduced her to Decedent and D.E. Adams as his aunt and uncle. When the couple became engaged in

6

2017, Decedent and D.E. Adams suggested that the couple move into the Rockville House. However, D.K. Adams declined that offer, instead choosing to live in Washington, D.C. In addition, D.K. Adams maintained a family cell phone plan in his name that included himself, Decedent, D.E. Adams, and D.K. Adams' mother. A cell phone bill was admitted into evidence reflecting these accounts.

In 2016, D.E. Adams was diagnosed with breast cancer, and, in approximately 2017 or 2018, Decedent began experiencing heart and lung problems. D.K. Adams transported D.E. Adams to her chemotherapy appointments at George Washington University Hospital, and she would stay at the D.C. Apartment on treatment days before returning to the Gaithersburg House. Decedent sometimes attended these appointments.

D.K. Adams further testified regarding an incident in 2018 where Decedent and D.E. Adams came to pick him up from a car dealership. A third party honked his horn because Decedent's car was blocking his path, and Decedent yelled at him, saying, "all you had to do was ask my wife to move the . . . car out the way instead of making all this . . . noise." The court reserved on the Board's objection to that statement (hereinafter, the "Car Dealership Statement") as being barred by the Dead Man's Statute and by prohibitions against hearsay.

In 2021, Decedent was admitted to MedStar Montgomery Medical Center. D.K. Adams was with D.E. Adams when she received a voicemail from a hospital staff member stating, "[Y]our husband has been admitted to the hospital." During that same hospitalization, staff at the hospital completed a Patient Information demographic sheet (hereinafter, the "Patient Information Sheet") for Decedent which stated that his marital

7

status was "Married" and listed D.E. Adams as his emergency contact. D.E. Adams' relationship to Decedent was listed as "Other." The court reserved on the Board's objection to that exhibit.

In the days before Decedent died, D.K. Adams was at the Gaithersburg House with him, preparing for D.E. Adams to be released from the hospital for hospice care. However, Decedent died in the Gaithersburg House before D.E. Adams was released from the hospital. D.E. Adams died the following week.

*Sara Adams' Testimony*

S. Adams testified that she first met D.E. Adams in 2012. She met Decedent for the first time in 2020. S. Adams knew that D.E. Adams and D.K. Adams were cousins; however, D.K. Adams referred to D.E. Adams as his aunt and to Decedent as his uncle.

In 2018, D.E. Adams attended S. Adams' bridal shower. When the host asked all the married women to offer advice to the bride-to-be, D.E. Adams participated along with all the other married attendees. The court reserved on the Board's objection to D.E. Adams' purported statement that she had been married for 35 years (hereinafter, the "Bridal Shower Statement"). S. Adams understood her to be referring to her relationship with Decedent. Photographs of D.E. Adams speaking at S. Adams' bridal shower were introduced into evidence.

S. Adams also recalled going to the Gaithersburg House for dinner in 2020. D.E. Adams and Decedent were making dinner together and looked like an "older married couple." S. Adams occasionally visited Decedent and D.E. Adams at the Gaithersburg

8

House with D.K. Adams in the next year. In her interactions with D.E. Adams, S. Adams heard her refer to Decedent as "my Sam."

*Post-Hearing Briefing*

At the conclusion of the testimony, the court directed the parties to brief the evidentiary issues, and set the case for a hearing in February of 2024. The court also directed McCarthy to continue his efforts to locate blood heirs. In January of 2024, the Board and the Adams Estate filed memorandums of law regarding the Board's evidentiary objections made during the hearing.

*February 2024 Hearing*

At the continued hearing in February of 2024, McCarthy advised the court that he had located the Blood Heirs in India, namely, Decedent's nephew and two nieces. Decedent's brother, the parent of the Blood Heirs, had died. McCarthy had been unable to locate Decedent's sisters. The court appointed counsel to represent the thus-far identified Blood Heirs' interests and ordered that counsel be paid out of the Duraiswamy Estate. The court then continued the matter until August of 2024.

*August 2024 Hearing*

In August of 2024, the Blood Heirs appeared at the hearing through counsel, along with the Adams Estate, the Board, and McCarthy. Counsel for the Blood Heirs joined in the Board's evidentiary objections raised at the prior hearing, stated that he intended to make a motion for judgment, and indicated that if the motion was denied, he intended to introduce documentary evidence. Counsel for the Adams Estate argued that the evidentiary

portion of the hearing concluded at the hearing in September of 2023, and that all that remained was closing arguments.

After hearing argument on the evidentiary issues that arose during the prior hearing, the court ruled that the Dead Man's Statute, codified at section 9-116 of the Courts and Judicial Proceedings Article ("CJP") of the Maryland Code,[6] barred the admission of the Car Dealership Statement and the Bridal Shower Statement. The court also excluded the Patient Information Sheet as hearsay after finding that it was not pathologically germane to a diagnosis or treatment. The court found that the voicemail left on D.E. Adams' phone was admissible.

The court heard and reserved on the Board's and the Blood Heirs' joint motion for judgment on the basis that the elements of a common-law marriage had not been demonstrated by the evidence. Counsel for the Blood Heirs then introduced into evidence three exhibits: 1) a 1980 deed for a property in Montgomery County, which showed that it was purchased by Decedent and stated that he was unmarried; 2) a 1992 deed of trust for the Gaithersburg House, which likewise was purchased by Decedent as an unmarried man;

---

[6] That statute provides:

> A party to a proceeding by or against a personal representative, heir, devisee, distributee, or legatee as such, in which a judgment or decree may be rendered for or against them, or by or against an incompetent person, may not testify concerning any transaction with or statement made by the dead or incompetent person, personally or through an agent since dead, unless called to testify by the opposite party, or unless the testimony of the dead or incompetent person has been given already in evidence in the same proceeding concerning the same transaction or statement.

CJP § 9-116.

10

and 3) Decedent's death certificate that listed his marital status as "NEVER MARRIED" and the "Informant" as D.K. Adams, whose relationship to Decedent was listed as "FRIEND."

The Adams Estate recalled D.K. Adams to testify about the death certificate. He testified that he provided the funeral home with the information on the death certificate, including that Decedent was never married because he was not able to locate a marriage certificate. On cross-examination, he was asked why he identified himself as Decedent's friend. He responded that he told the funeral home that he was Decedent's relative; however, he could not provide verification of his relation to the funeral home.

After hearing closing arguments, the court held the matter *sub curia*. Slightly in excess of a month later, the court issued its opinion and order. In sum, the court found the evidence presented was legally insufficient to demonstrate that Decedent and D.E. Adams established a common-law marriage in Washington, D.C. Accordingly, the court granted the motion for judgment. This timely appeal followed.

Additional facts will be incorporated below as necessary.

## DISCUSSION

**I.**   **THE ISSUES OF WHETHER THE ORPHANS' COURT ERRED IN PERMITTING THE BOARD TO REMAIN AS AN INTERESTED PARTY AFTER THE BLOOD HEIRS WERE ASCERTAINED AND IN APPOINTING COUNSEL TO REPRESENT THE BLOOD HEIRS ARE NOT PRESERVED.**

The Adams Estate contends that the orphans' court erred by permitting the Board to remain as an interested party after the Blood Heirs were located. It further asserts that the

orphans' court erred in appointing counsel to represent the Blood Heirs and ordering that their attorneys' fees be paid out of the Duraiswamy Estate.

The Blood Heirs respond that the court did not err in allowing the Board to remain as an interested party after the Blood Heirs were ascertained because the Board had already filed briefs and participated in the prior proceedings. The Blood Heirs also claim that the court acted within its discretion when it appointed counsel to represent them and allowed their counsel fees to be paid from the Duraiswamy Estate.[7]

"Ordinarily, an appellate court will not decide . . . issue[s] unless [they] plainly appear[] by the record to have been raised in or decided by the trial court[.]" Md. Rule 8-131(a). This preservation requirement "is a matter of basic fairness to the trial court and to opposing counsel" and is "fundamental to the proper administration of justice." *In re Kaleb K.*, 390 Md. 502, 513 (2006) (quoting *Medley v. State*, 52 Md. App. 225, 231 (1982)). *See also Barber v. Catholic Health Initiatives, Inc.*, 180 Md. App. 409, 437 (2008) (indicating that appellate review of unpreserved issues is a discretionary power that should be rarely exercised) (citation omitted).

Here, the only point at which the Adams Estate raised an objection to the Board participating as an interested party was at the September 2023 hearing *prior to* the identification of the Blood Heirs, which occurred at the February 2024 hearing. The court overruled the Adams Estate's objection to the Board's participation and concluded that the

_____

[7] McCarthy filed an informal brief contending that, as personal representative of the Duraiswamy Estate, he is only a stakeholder in the case *sub judice* and that the "real parties-in-interest" are the Adams Estate and the Blood Heirs. Thus, he takes no position on who should prevail on the issues presented on appeal.

Board was an interested party under ET section 9-108. The Adams Estate does not challenge that ruling on appeal.

The Adams Estate did not object to the Board's continued participation at the February 2024 or August 2024 hearings, at which time the Blood Heirs were ascertained. Having failed to object to the Board's participation *after* the Blood Heirs were identified, that argument as raised by the Adams Estate on appeal is not preserved for our review, and we decline to exercise our discretion to address the issue.[8] Md. Rule 8-131(a); *see also In re Kaleb K.*, 390 Md. at 513; *Barber,* 180 Md. App. at 437.

The issues surrounding the appointment of counsel to the Blood Heirs are unpreserved for the same reason. The Adams Estate did not object to the appointment of counsel for the Blood Heirs at the February or August 2024 hearings, or to the orphans' court's order that the attorneys' fees for appointed counsel be paid out of the Duraiswamy Estate. Accordingly, these issues are unpreserved for review, and we, likewise, decline to address them. Md. Rule 8-131(a); *See also In re Kaleb K.*, 390 Md. at 513; *Barber,* 180 Md. App. at 437.

---

[8] Even if preserved, we would nevertheless conclude that the Board remained an interested party until the status of the Adams Estate and the Blood Heirs was conclusively determined by the orphans' court. As McCarthy explained at the August 2024 hearing, the Board would remain a distributee of the Duraiswamy Estate if the court found that there was no common-law marriage and if all the blood heirs identified were not located. ET § 9-108

## II. THE ORPHANS' COURT DID NOT ABUSE ITS DISCRETION IN PERMITTING THE BLOOD HEIRS TO PRESENT ARGUMENT AND EVIDENCE AT THE AUGUST 2024 HEARING.

The Adams Estate contends that the orphans' court erred by permitting the Blood Heirs to present argument and introduce evidence at the August 2024 hearing. The Blood Heirs contend that the court acted within its discretion when it allowed them to submit evidence.

Courts generally have broad discretion to receive additional evidence after a trial or evidentiary proceeding and obtaining appellate reversal of such a decision is difficult. *Della Ratta v. Dyas*, 183 Md. App. 344, 374 (2008) (citation omitted). "Principal among the factors to be considered are whether the proffered evidence is essential to a party's case or supplemental, whether a party will be improperly prejudiced, and whether the omission was inadvertent." *Id.* (internal citations and quotation marks omitted). In the context of receiving additional evidence, an abuse of discretion may occur if the court's decision is arbitrary or if the decision is unfairly prejudicial. *Cooper v. Sacco*, 357 Md. 622, 637–38 (2000) (citing *Shook v. Shook*, 213 Md. 603, 612 (1957); *Guyer v. Snyder*, 133 Md. 19, 22 (1918); *Gillespie-Linton v. Miles*, 58 Md. App. 484, 499–500, *cert denied*, 300 Md. 794 (1984); and *Bama, Inc. v. Anne Arundel Cnty.*, 53 Md. App. 14, 20 (1982)). We will not disturb the court's ruling unless the court acted without reference to any guiding rules or principles, or unless no reasonable person would take the view adopted by the trial court. *See Letke Sec. Contractors, Inc. v. U.S. Sur. Co.*, 191 Md. App. 462, 474 (2010).

Here, the Blood Heirs had not been identified at the time of the September 2023 evidentiary hearing and, consequently, were not and could not be permitted to participate

14

in that hearing by cross-examining witnesses, calling witnesses, introducing evidence, or making argument. Given that their interest in the Duraiswamy Estate was antagonistic to the interest of the Adams Estate, the orphans' court believed it important to provide them an opportunity to be heard. Further, the Adams Estate was not improperly prejudiced by the orphans' court's decision to reopen evidence, given that the Adams Estate was permitted to recall D.K. Adams in response to the evidence introduced by Blood Heirs. The orphans' court did not abuse its discretion in allowing the Blood Heirs to participate in the August 2024 hearing. *See Dyas*, 183 Md. App. at 374; *Cooper*, 357 Md. at 637–38.

III.     **THE ORPHANS' COURT DID NOT ERR IN EXCLUDING EVIDENCE AT THE HEARINGS.**

The orphans' court ruled that three pieces of evidence were inadmissible at the hearings: 1) the Patient Information Sheet; 2) the Car Dealership Statement; and 3) the Bridal Shower Statement. The court ruled that the Patient Information Sheet was inadmissible hearsay, and that the two statements were inadmissible under the Dead Man's Statute located at CJP section 9-116.

The Adams Estate contends the orphans' court misapplied the law in ruling that these items of evidence were inadmissible. The Blood Heirs posit that the court correctly interpreted the law in excluding the evidence.

We generally review a trial court's decision to admit or exclude evidence applying an abuse of discretion standard. *Gasper v. Ruffin Hotel Corp. of Maryland, Inc.*, 183 Md. App. 211, 224 (2008). However, if the evidentiary ruling "involves an interpretation and application of Maryland constitutional, statutory, or case law, our Court must determine

15

whether the trial court's conclusions are legally correct under a *de novo* standard of review." *Schisler v. State*, 394 Md. 519, 535 (2006) (further citation and internal quotation marks omitted). Even if the court erroneously admitted or excluded evidence, we will only find it to be reversible error if the complaining party is prejudiced by the ruling. *See* Md. Rule 5-103(a). This means that "we will not disturb an evidentiary ruling by a trial court if the error was harmless." *Lamalfa v. Hearn*, 457 Md. 350, 373 (2018) (quoting *Brown v. Daniel Realty Co.*, 409 Md. 565, 584 (2009)).

### i. The Patient Information Sheet

We perceive no error in the court's exclusion of the Patient Information Sheet. The orphans' court excluded this evidence as inadmissible hearsay. Ordinarily, hospital records may be admitted under the business records exception to the hearsay rule. *See State v. Bryant*, 361 Md. 420, 430 n.5 (2000) (citing Md. Rule 5-803(b)(6)). However, not every statement in a medical record is admissible. Rather, to be admissible under that exception, "statements in a hospital record must be pathologically germane to the physical condition which caused the patient to go to the hospital in the first place." *Hall v. Univ. of Md. Med. Sys. Corp.*, 398 Md. 67, 92 (2007) (further citation and internal quotation marks omitted). A statement is "pathologically germane" if it "fall[s] within the broad range of facts which under hospital practice are considered relevant to the diagnosis or treatment of the patient's condition." *Id*. (further citation omitted).

Here, Decedent's marital status and the name of his emergency contact, which were the statements the Adams Estate sought to admit, were not the type of facts that were relevant to Decedent's diagnosis or to the treatment of his condition. *See id.* Consequently,

16

those statements did not fall within the business records exception as it applies to medical records, and the orphans' court did not err by excluding that evidence as hearsay.

### ii. The Car Dealership Statement

In Maryland, the Dead Man's Statute provides that:

> A party to a proceeding by or against a personal representative, heir, devisee, distributee, or legatee as such, in which a judgment or decree may be rendered for or against them, or by or against an incompetent person, may not testify concerning any transaction with or statement made by the dead or incompetent person, personally or through an agent since dead, unless called to testify by the opposite party, or unless the testimony of the dead or incompetent person has been given already in evidence in the same proceeding concerning the same transaction or statement.

CJP § 9-116.

"Maryland courts have strictly construed the statute, so as to render admissible[] as much testimony as possible while preventing self-interested perjury." *Montgomery Cnty. v. Herlihy*, 83 Md. App. 502, 511–12 (1990) (internal citations, alterations, and quotation marks omitted). "The testimony meant to be excluded by the [s]tatute is only testimony of a party to a cause which would tend to increase or diminish the estate of the decedent by establishing or defeating a cause of action by or against the estate." *Reddy v. Mody*, 39 Md. App. 675, 679 (1978) (further citation omitted). For purposes of the Dead Man's Statute, a party is "one who has an interest in the property sought or a person having a direct pecuniary and proprietary interest in the outcome of the case." *Id.* at 682 (citing *Trupp v. Wolff*, 24 Md. App. 588, 599 (1975)). "Except in very unusual cases, the persons excluded from testifying are not those with *an interest of any sort*, but rather traditional real parties in interest and their representatives." *Id*. (emphasis added).

17

Here, the Adams Estate was an interested party in a proceeding initiated by McCarthy, the personal representative of the Duraiswamy Estate. D.K. Adams is the personal representative of the Adams Estate and a first cousin of D.E. Adams. If the Adams Estate prevailed in establishing that D.E. Adams and Decedent were common-law spouses, the Adams Estate would be the sole heir of the Duraiswamy Estate, and D.K. Adams would stand to benefit. *See* ET § 3-102 (indicating that the surviving spouse of a decedent with no minor children takes the entire intestate estate). D.K. Adams does not dispute that he could be a distributee of the Adams Estate and thus has a pecuniary interest in the outcome of the case. However, the Adams Estate argues that the outcome of its claim that D.E. Adams and Decedent entered a common-law marriage in Washington, D.C. would neither increase nor diminish the Duraiswamy Estate, and for that reason D.K. Adams' testimony on the Car Dealership Statement should have been allowed.

This Court's decision in *Zadnik v. Ambinder*, 258 Md. App. 1 (2023) is instructive. There, this Court reasoned that the Dead Man's Statute would not preclude an alleged surviving common-law spouse from testifying as to the alleged common-law marriage in a wrongful death action because it is brought for the benefit of the person bringing the action, not for the benefit of the decedent, and, consequently, would not "increase or diminish the estate of the decedent." *Id*. at 14–15 (quoting *Reddy*, 39 Md. App. at 679). We thus reversed the trial court's exclusion of the surviving spouse's testimony on the formation of the common-law marriage out of state, because in a wrongful death action, the outcome has no impact on the estate of the decedent. *See id.* at 15, 17. However, we noted that "[t]he testimony meant to be excluded by [CJP § 9-116 ] is [] testimony . . .

18

which would tend to increase or decrease the estate of the decedent by establishing or defeating a cause of action by or against the estate." *Id.* at 14 (citation omitted).

Here, McCarthy took no position on the existence of the common-law marriage. However, D.K. Adams was a representative of the Adams Estate, had a pecuniary interest in the outcome of the case, and had an interest adverse to the Board and the Blood Heirs. Thus, we are satisfied that CJP § 9-116 precludes statements such as the Car Dealership Statement because its admittance "would tend to . . . diminish the estate of [Decedent] by establishing or defeating a cause of action by or against the estate." *See Zadnik*, 258 Md. App. at 14.

### iii. The Bridal Shower Statement

The same cannot be said of the Bridal Shower Statement. As this Court explained in *Trupp*, the Dead Man's Statute has been construed to "favor[] admissibility of testimony in close cases[.]" 24 Md. App. at 599. Specifically, as it relates to this case, we noted that the Supreme Court of Maryland has permitted the admission of the testimony of the "husband of a party who would obviously benefit emotionally as well as tangibly by his wife's recovery[.]" *See id.* (citing *Marx v. Marx*, 127 Md. 373 (1916)).[9]

The Blood Heirs rely upon *Farah v. Stout*, 112 Md. App. 106 (1996) to assert that the orphans' court correctly excluded the Bridal Shower Statement. In that case, this Court affirmed the exclusion of a husband's testimony in an action brought by his wife against

---

[9] In *Marx*, the son of a decedent was permitted to testify about statements made by the decedent to the son's wife in an action brought by the wife for services rendered by her to the decedent. *Marx*, 127 Md. at 547–48.

an estate for services rendered—services the couple alleged were rendered in exchange for a promise by the decedent to be recompensed by a bequest in the will to both the husband and wife. *Id.* at 110, 117–18. Unlike in *Trupp*, the husband in *Farrah* was originally a named party in the action before he assigned his interest in his wife's claim to his wife. *Id.* at 115–16. On those unique facts, this Court held that the husband remained a real party in interest and that to permit him to testify about statements made by the decedent in support of his wife's claim would undermine the purpose of CJP § 9-116. *Id.* at 117. Citing *Trupp* and *Marx*, this Court noted that the decision did not "contradict[] any prior applications of the statute permitting testimony from children or spouses who, undeniably, stood to gain *simply by virtue of their relationship with a party*." *Id*. at 118 n.2 (emphasis added).

In the instant case, S. Adams was never a party. As D.K. Adams' wife, she stood to gain merely because of her relationship with him should he become a distributee of the Adams Estate. Construing the statute strictly, we are not satisfied that her testimony was barred under the Dead Man's Statute.[10] Nevertheless, as we will explain, the error in the exclusion of the Bridal Shower Statement was harmless because the orphans' court ruled that, even had it been admitted, it would not have been sufficient to satisfy the court that D.E. Adams and Decedent were common-law spouses.

---

[10] The orphans' court did not reach the issue of whether S. Adams' testimony was otherwise inadmissible hearsay.

**IV. THE ORPHANS' COURT DID NOT ERR IN FINDING THAT THE EVIDENCE WAS INSUFFICIENT TO ESTABLISH THAT DECEDENT AND D.E. ADAMS WERE IN A COMMON-LAW MARRIAGE.**

The Adams Estate asserts that the orphans' court erred in its conclusion that the evidence was legally insufficient to establish a common-law marriage between D.E. Adams and Decedent. The Blood Heirs contend that the court was correct in finding that the Adams' Estate presented legally insufficient evidence to establish that a common-law marriage existed between Decedent and D.E. Adams.

"In reviewing [a] decision of the [o]rphans' [c]ourt, we defer to its findings of fact and will not set them aside unless clearly erroneous." *Matter of Watkins*, 241 Md. App. 56, 70 (2019) (citing Md. Rule 8-131(c)). "Where a case involves the application of Maryland statutory and case law, our Court must determine whether the lower court's conclusions are legally correct under a *de novo* standard of review." *Clancy v. King*, 405 Md. 541, 554 (2008) (internal quotation marks and further citation omitted).

"Although common law marriage has never been part of Maryland law, Maryland recognizes marriages that are 'valid where contracted.'" *Zadnik*, 258 Md. App. at 11 (quoting *Blaw-Knox Constr. Equip. Co. v. Morris*, 88 Md. App. 655, 669–71 (1991)). "[T]he validity of a marriage is determined by the law of the place where it was contracted[.]" *Morris*, 88 Md. App. at 670. As the Supreme Court of Maryland stated in *Laccetti v. Laccetti*, 245 Md. 97, 101 (1967), "Common-law marriages are recognized in the District of Columbia." *See also John Crane, Inc. v. Puller*, 169 Md. App. 1, 63 (2006).

"Whenever a party asserts that [two people] were united in marriage by common law in a jurisdiction that sanctions such marriages, the burden of proof is upon the party

21

asserting the common-law marriage." *Goldin v. Goldin*, 48 Md. App. 154, 157–58 (1981).

Under Washington D.C. law, the existence of a common-law marriage must ordinarily be established by a preponderance of the evidence. *Gill v. Nostrand*, 206 A.3d 869, 875 (D.C. 2019). The Adams Estate contends that the orphans' court erred by concluding that the evidence presented here was insufficient to establish the elements of a common-law marriage under Washington, D.C. law by a preponderance of the evidence.

The elements of common-law marriage in Washington D.C. are "cohabitation following an express mutual agreement, which must be in words of the present tense, to be permanent partners with the same degree of commitment as the spouses in a ceremonial marriage." *In re Estate of Jenkins*, 290 A.3d 524, 528 (D.C. 2023) (quoting *Gill*, 206 A.3d at 875). The "best evidence of an express mutual agreement is the testimony of the parties" to that agreement. *U.S. Fid. & Guar. Co. v. Britton*, 269 F.2d 249, 252 (D.C. Cir. 1959). However, whereas here, the parties to the alleged common-law marriage are no longer available as witnesses, "such an agreement can 'be inferred from the character and duration of [the couple's] cohabitation, or from other circumstantial evidence such as testimony by relatives and acquaintances as to the general reputation regarding the parties' relationship.'" *In re Estate of Martin*, 328 A.3d 405, 412 (D.C. 2024) (quoting *Mesa v. United States*, 875 A.2d 79, 83 (D.C. 2005)) (alteration in *In re Estate of Martin*). Nevertheless, because litigants seeking to prove the existence of a common-law marriage often seek a pecuniary benefit, Washington D.C. courts have "repeatedly recognized that claims of common[-]law marriage should be closely scrutinized and subjected to

skepticism, given the ready availability of ceremonial marriage." *Id*. at 414 (internal quotation marks and further citation omitted).

Consistent with the above, the orphans' court explained that the Adams Estate was obligated to adduce evidence that Decedent and D.E. Adams "cohabitated [in Washington D.C.] following an express mutual agreement between the parties to be permanent partners . . . in the words of the present tense." Both parties to that alleged common-law union were deceased. Thus, the Adams Estate sought to prove the existence of an express mutual agreement between Decedent and D.E. Adams by circumstantial evidence pertaining to their relationship, their cohabitation, and their general reputation in the community as a married couple. The orphans' court found that the evidence was lacking.

The court emphasized that although D.K. Adams' testimony established a degree of cohabitation at the D.C. Apartment starting in the mid-1980s, the evidence also showed that D.E. Adams and Decedent maintained separate residences and did not always cohabitate. For example, Decedent purchased property in Montgomery County prior to the time that D.K. Adams recalled them staying together at the D.C. apartment, and D.K. Adams referred to the D.C. apartment as D.E. Adams' apartment. Moreover, there was no evidence as to the title of the D.C. apartment, and D.E. Adams stayed at the D.C. apartment alone during the work week after Decedent retired to remain closer to her office. The court found that this evidence showed that the two maintained "separate lifestyles" even while they frequently stayed together. In sum, the court found that evidence bearing upon the "character and duration of their cohabitation in D.C." did not support an inference that the two expressly agreed to be married.

23

The orphans' court also assessed the evidence of their general reputation as a married couple. This consisted of D.K. Adams' testimony that he viewed them as a married couple; the family cell phone plan that also included Decedent and D.E. Adams; the voicemail for D.E. Adams from the hospital referring to Decedent as "her husband"; and S. Adams' testimony that she observed Decedent and D.E. Adams to act like a married couple. The court emphasized that most of D.K. Adams' testimony and all of S. Adams' testimony pertained to their reputation as a married couple after they were living in Maryland, which had limited relevance to the issue of whether they entered into a common-law marriage while they cohabitated in Washington, D.C. Consistent with the skepticism applied to claims of a common-law marriage, *see In re Estate of Martin*, 328 A.3d at 414, the court was unwilling to rely solely upon D.K. Adams' testimony about the parties' marriage-like relationship when they stayed together in Washington, D.C. during his early childhood, given that he was an interested party.

Significantly, the orphans' court reasoned that even if it had admitted (and credited) the excluded testimony discussed in the prior section, the statements allegedly made by Decedent and D.E. Adams would not have tipped the scales.[11] The court emphasized that both statements were made many years after Decedent and D.E. Adams lived together in Washington, D.C. and both involved "situations in which a person would use shorthand to

---

[11] With respect to S. Adams' testimony concerning the Bridal Shower Statement, the orphans' court noted that D.E. Adams' statement at the bridal shower in 2018 suggested that D.E. Adams believed she and Decedent had been married for 35 years; however, the court noted that S. Adams' testimony "did not provide any insight into the character and duration of [D.E. Adams' and Decedent's] cohabitation in D[.]C."

call someone their spouse rather than detail the true nature of their relationship to strangers." Likewise, the Patient Information Sheet did not provide information about the nature of Decedent's and D.E. Adams' relationship while they lived in Washington, D.C.

The court reasoned that there was also evidence weighing against the existence of a common-law marriage, namely, the absence of any evidence of financial entanglement between the parties. The court emphasized that the Adams Estate did not present evidence concerning the title or lease to the Washington, D.C. apartment, including whether it was jointly titled. Additionally, there was no evidence that the Decedent and D.E. Adams shared expenses, had jointly titled cars or real property, or had jointly titled credit cards.

Further, the evidence established that Decedent owned the Rockville House and the Gaithersburg House in his sole name, and both deeds listed him as not married. The Adams Estate is correct that evidence of financial entanglement is not required to prove the existence of a common-law marriage. However, evidence of financial entanglement can support an inference of an intent to live as a married couple. *See Cleary v. Cleary*, 318 A.3d 536, 544–45 (D.C. 2024) (reversing the grant of summary judgment where evidence of a couple's joint financial venture was circumstantial evidence that could support a finding that they were in a committed marriage-like relationship). Likewise, the absence of that evidence can support a contrary inference. *See id.* (indicating that lack of serious financial entanglement can constitute evidence "that the parties did not have the requisite commitment" to participate as spouses).

The Adams Estate's reliance upon this Court's decision in *Morris*, 88 Md. App. 655, is misplaced. In that case, relying upon Pennsylvania law, we held that a trial court erred

by granting a motion for judgment in a jury trial on the issue of whether a two-night stay in a hotel in Pennsylvania while visiting for a funeral was sufficient to satisfy the cohabitation requirement of common-law marriage. *Id*. at 670–72. Nonetheless, that case is distinguishable from the case *sub judice*. Here, unlike in *Morris*, there was no jury in the trial court proceedings. *See id.* at 671. Thus, when the orphans' court here granted a motion for judgment, it did so as the finder of fact and law because there was no jury. *See Bricker v. Warch*, 152 Md. App. 119, 135 (2003). Hence, the court was "not compelled to make any evidentiary inferences in favor of the party against whom the motion for judgment [was] made." *Id.* "[T]he trial judge is allowed to evaluate the evidence as though he were the jury, and to draw his own conclusions as to the evidence presented, the inferences arising therefrom[,] and the credibility of the witnesses testifying." *Id.* at 136 (internal quotation marks and further citation omitted).

As the fact finder, the orphans' court determined that the evidence did not support a finding that it was more likely than not that before or during their cohabitation in Washington, D.C., D.E. Adams and Decedent expressed an intent to be permanent partners with the same degree of commitment as those ceremonially married. *See In re Estate of Jenkins*, 290 A.3d at 528. The court was not obligated to credit any or all the testimony from D.K. Adams or his wife. *See Bricker*, 152 Md. App. at 136. It was entitled to weigh the evidence supporting the existence of a marriage, as well as the evidence countering the existence of a marriage. *Id.* As this Court has explained, "it is far easier to sustain as not clearly erroneous the decisional phenomenon of not being persuaded than it is to sustain the very different decisional phenomenon of being persuaded." *Starke v. Starke*, 134 Md.

App. 663, 680 (2000). This is so because "[m]ere non-persuasion . . . requires nothing but a state of honest doubt. It is virtually, albeit perhaps not totally, impossible to find reversible error in that regard." *Id*. at 680–81. Here, the orphans' court's conclusion that it was not persuaded in this case was not clearly erroneous because there was ample evidence in the record to support its factual findings. Accordingly, we affirm the conclusion of the orphans' court based on its findings that there was no common-law marriage between Decedent and D.E. Adams.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY, SITTING AS THE ORPHANS' COURT, AFFIRMED. COSTS TO BE PAID BY APPELLANT.**
